Denkmann Lumber Co., et al. *v.* Morgan, et al.

Jan. 25, 1954

No. 38856 50 Adv. S. 28 69 So. 2d 802

694

*Hermon Dean,* Canton, for appellants.

*Davis & Hammond,* Columbia, for appellees.

Kyle, J.

G. W. Morgan and others, complainants, filed their bill in the Chancery Court of Marion County against the Denkmann Lumber Company, a corporation, and others, defendants, seeking to cancel a reservation in a deed of conveyance from the Denkmann Lumber Company to G. W. Morgan dated January 11, 1934, in which the Denkmann Lumber Company conveyed to G. W. Morgan approximately 220 acres of land in Marion County, subject to a reservation in favor of the grantor of seven-eighths of all oil, gas and other minerals on said land.

The record shows that the Denkmann Lumber Company, on February 26, 1927, executed a formal contract to sell to G. W. Morgan approximately 220 acres of land in Marion County for the sum of $1,200, of which

the sum of $400 was paid in cash, and the balance was evidenced by three promissory notes, becoming due and payable as follows: One $200 note due on or before November 1, 1927; one $300 note due on or before November 1, 1928; and one $300 note due on or before November 1, 1929; each of said notes bearing interest from date until paid at the rate of six per cent per annum. The contract provided that the purchaser should pay all taxes levied and assessed against the land, when and as the same should become due; and that in the event default should be made in the payment of said taxes, or in the payment of any of said notes when due, all of the indebtedness should become due and payable forthwith, at the option of the seller, and the seller should have the right to institute suit for the full amount due and unpaid, or to declare the contract breached and at an end. The contract further provided that, when the purchase price was paid in full, the seller should execute and deliver to the purchaser a warranty deed to the land and "that in the event the seller should be unable or should refuse to execute and deliver such warranty deed when purchaser becomes entitled thereto, then this contract shall be and become effective as a warranty deed, conveying the title which should be conveyed by separate deed." The contract further provided that, if the seller should exercise its option to declare the contract at an end, because of a breach of the contract by the purchaser, the purchaser should without delay deliver up the property to the seller, and that all amounts paid by the purchaser should be retained by the seller as rental for the property during the time that same should have been in the purchaser's possession. And it was expressly provided that the seller should not be required to account to the purchaser for the value of any additions or betterments placed on the land by the purchaser.

The record shows that G. W. Morgan went into possession of the land immediately and during the next few years made valuable improvements on the land. He

paid the $200 note which became due November 1, 1927, but was unable to pay the other two notes as they became due, and by agreement of the parties the time for payment of the remaining $600 was extended from year to year from 1928 to 1932. Morgan, however, paid the interest each year, which amounted to $36. On March 23, 1932, he filed his contract for record and had it duly recorded in the office of the Chancery Court Clerk in Columbia.

On December 9, 1930, Morgan conveyed to J. L. Cooper 80 acres of the land. Cooper later conveyed the 80-acre tract to J. L. Thornhill, who in turn conveyed the same to Jewel Rayborn and his wife, Mrs. Edith Rayborn. Thornhill, however, retained title to all gas, oil and minerals on the 80-acre tract. Morgan later conveyed other parts of the land to his sons, C. C. Morgan, C. R. Morgan and C. E. Morgan.

On January 11, 1934, the Denkmann Lumber Company executed a deed of conveyance of the 220 acres of land to G. W. Morgan, reserving to itself, however, "seven-eighths of all oil, minerals and/or gases that may be on, in or under said lands, or any part thereof." The deed recited a consideration of $500 paid in cash. The deed was filed for record March 9, 1934. On December 15, 1942, the Denkmann Lumber Company executed to its stockholders, all of whom were named as parties defendant in the bill of complaint filed in this cause, a mineral deed, conveying to said stockholders the oil, gas and other mineral rights of the corporation in the above mentioned 220 acres of land. On September 23, 1943, the stockholders executed an oil, gas and mineral lease on said land to Rollin V. Hill, Jr., and on October 20, 1943, said oil, gas and mineral lease was assigned by Hill to Humble Oil and Refining Company.

The complainants filed their original bill on November 19, 1948, and attached to their bill a copy of the contract to sell executed by Denkmann Lumber Company in favor of G. W. Morgan on February 26, 1927. In their

bill the complainants alleged that G. W. Morgan had paid to the Denkmann Lumber Company the full amount of the purchase price agreed to be paid for the 220 acres of land, and that the Denkmann Lumber Company, under the terms of the contract, was bound to execute and deliver to G. W. Morgan a warranty deed to said land without any reservation. The complainants alleged that the reservation contained in the deed executed by Denkmann Lumber Company to G. W. Morgan on January 11, 1934, retaining unto the Denkmann Lumber Company seven-eighths of all oil, gas and minerals in said land, was inserted in said deed without the knowledge or consent of the said G. W. Morgan and his grantees, and that the deed was placed of record without their knowledge, and that they did not know that the deed had been placed of record until three or four years before the suit was filed. The complainants in their bill asked that the deed be reformed and that the clause in the deed reserving unto the Denkmann Lumber Company seven-eighths of all oil, gas and other minerals in said lands be eliminated, or, if mistaken in this, that the deed itself be annulled and set aside, as not complying with the contract of sale, and that title to the lands, and all oil, gas and other minerals, be vested in the said G. W. Morgan and his grantees, and that all claims of the Denkmann Lumber Company and its stockholders in and to the oil, gas and other minerals on said lands, be cancelled, and that the complainants be decreed to be the owners of said oil, gas and other minerals. The complainants also prayed for general relief.

The defendants in their answer admitted that the contract to sell had been entered into by and between the Denkmann Lumber Company and G. W. Morgan on February 26, 1927, as alleged in the bill of complaint. But the defendants averred that G. W. Morgan failed to comply with the terms of the contract, and that on September 30, 1933, the Denkmann Lumber Company declared the contract terminated; that thereafter a new

agreement was negotiated with G. W. Morgan covering the sale of the land; and that under the terms of that agreement G. W. Morgan agreed to pay to the Denkmann Lumber Company the sum of $500, and the company agreed to execute and deliver to him a deed reserving the minerals. The defendants further stated in their answer that the Denkmann Lumber Company, pursuant to such new agreement, executed such deed and deposited the same in escrow in a bank at Columbia, to be delivered to G. W. Morgan upon the payment of the $500; that thereafter, one of the attorneys of record for the complainants, who at that time represented G. W. Morgan, wrote the company a letter in which he stated that unless the company was willing to convey to G. W. Morgan at least one-eighth of the minerals he would not be able to obtain a Federal Land Bank loan; and that the company pursuant to the request contained in that letter recalled the first deed that had been placed in the bank in escrow and executed a new deed, reserving only seven-eighths of the minerals, and sent the same to the bank for delivery to the purchaser upon the payment of the $500; the company in time received the sum of $500, and the bank was authorized to deliver the deed; and that the company had nothing to do with the deed after its release by the bank.

Before the case was tried the complainants filed two amendments to their original bill. In their first amendment, the complainants alleged that they had been in the exclusive and continuous possession of the lands for more than ten years, and had acquired title thereto by adverse possession; and they denied that the 1927 contract had ever been forfeited, or that any new agreement had ever been made. In their second amendment, the complainants alleged that the Denkmann Lumber Company had granted to G. W. Morgan extensions of time for the payment of the past due installments of the purchase price, that there had never been a forfeiture of

the original contract, and that the indebtedness mentioned in the original contract had been fully paid.

Upon the hearing before the chancellor, G. W. Morgan testified that he entered into the agreement to purchase the land in 1927, and paid $400 in cash at the time the contract was signed; and that he paid the first note for $200 at the date of its maturity on November 1, 1927. He stated that, when the other notes became due, the land agent of the company, who was in charge of the collection of the notes, told him that it would be all right with the company if he paid only the interest and the taxes and kept the land improved. He said that he erected two dwelling houses on the land, built a cottonseed house and some cribs, bored a well, and built a fence around the property. He said that he paid the interest that became due each year on the notes, and that he paid the taxes, and that he made some small payments from year to year on the principal of the indebtedness. Extensions of time for the payment of the balance due on the land were granted from year to year under the above stated conditions. Morgan stated that he sold a part of the land to J. L. Cooper in 1931 and during the fall of 1933 he agreed to sell a part of the land to his son, C. C. Morgan. At that time he still owed Denkmann Lumber Company about $500; and the balance was finally paid out of the proceeds of a loan obtained by C. C. Morgan from the Federal Land Bank in 1934.

Morgan stated that he thought he had a warranty deed to the land. He denied that he had ever received any notice from the company that the contract had been forfeited. He denied that he had received a letter from M. L. White, the land agent of the company, dated September 30, 1933, notifying him of the cancellation of the contract; and he denied that any new contract had been negotiated with the company relating to the purchase of the land. He stated that he had never seen the deed executed by Denkmann Lumber Company to him on January 11, 1934, in which the company reserved seven-

eighths of the oil, gas and minerals in and on the land. He knew nothing about that deed until his son received the abstracts of title from the Federal Land Bank two or three years before the suit was filed.

Morgan denied that Kelly Hammond was representing him as an attorney in 1933 and 1934, or that he knew anything about the letter written by Kelly Hammond to M. L. White on December 29, 1933, concerning the oil, gas and mineral reservation. He was questioned about two deeds of trust executed by him in 1938 to the Federal Land Bank, and the Land Bank Commissioner; but he did not remember anything about the execution of those instruments. He was questioned about his endorsement of a check for $590.77 issued by the Federal Land Bank in connection with the C. C. Morgan loan in 1934, and also about his signing of a creditor's receipt for the sum of $501 in connection with the disbursement of the proceeds of that loan. He admitted the signature, but stated that he had never received any of the money; and he stated that he did not know that the deed of trust which C. C. Morgan had executed to the Federal Land Bank contained a reservation of seven-eighths of the minerals in favor of the Denkmann Lumber Company.

C. C. Morgan testified that, when he purchased a part of the land from his father in 1934, he understood that his father had a warranty deed to the land—a bonded title. He applied to the Federal Land Bank for a loan to enable him to make the purchase and employed Kelly Hammond to attend to the matter of procuring the loan for him from the Federal Land Bank. His agreement with his father was that he was to pay the $500 that his father still owed the Denkmann Lumber Company, and to convey to his father a parcel of land that he already owned. He stated that he did not know that the Denkmann Lumber Company had retained a seven-eighths interest in the oil, gas and minerals on the land, until the abstracts of title were returned to him by the Federal

Land Bank two or three years before the date of the trial. He stated that after he had purchased the land from his father he went into possession of the same, and was still in possession of the same at the time of the trial, with the exception of 35 acres, which he had reconveyed to his father and which had then been sold to his brother. He admitted that he had executed a deed of trust to the Federal Land Bank dated February 2, 1934, which recited that it was subject to a reservation of seven-eighths of the oil, gas and minerals by the Denkmann Lumber Company, as shown in its deed to G. W. Morgan dated January 11, 1934. But he stated that he did not read the deed of trust before signing it. He stated that he was familiar with the check for $590.77 that was issued by the Federal Land Bank at the time the loan was procured, and he acknowledged that he endorsed the check. He stated that G. W. Morgan did not receive the $500, but that the money was paid to the Denkmann Lumber Company. He stated that Mr. Sebe Dale, who was local correspondent for the Federal Land Bank of New Orleans at that time, handled the check and distributed the money. He stated that neither he nor his father ever saw the deed of conveyance from Denkmann Lumber Company to G. W. Morgan, which contained the mineral reservation. He went to the Chancery Clerk's office a few days after he purchased the land to get the deed, but the clerk could not find it, and although the clerk told him that it had been recorded, he did not examine the record.

C. R. Morgan testified that he had purchased a parcel of the land from his father in April 1934, and that he understood his father had a clear deed to the property. He had no abstract of title made at that time. He admitted that he had executed two deeds of trust to the Federal Land Bank of New Orleans in 1934 securing loans, but he did not know anything about the reservation of the mineral rights by Denkmann Lumber Company until two or three years before the trial. He stated

that he owned 45 acres of the Denkmann Lumber Company land, and that he had been in possession of it since he purchased it from his father, and that he had built a house on it and had bored a well; that he had all of the land under fence and a part of the land in cultivation, that he had paid taxes on it and had claimed it as his own.

Cletus Morgan testified that he purchased 15 acres of land from his father in 1938 or 1939; that his father conveyed the land to him by a warranty deed, without any reservation, and that he did not know that there was any reservation in the deed executed by the Denkmann Lumber Company to his father or that the Denkmann Lumber Company was claiming any interest in the minerals until sometime during the year 1949. He admitted that, when he purchased the land from his father he assumed an indebtedness owing to the Federal Land Bank of New Orleans, which he later paid to the Federal Land Bank, but he did not know that the Federal Land Bank's deed of trust contained a reservation of seven-eighths of the minerals reserved by the Denkmann Lumber Company.

J. L. Thornhill testified that he purchased a part of the land from J. L. Cooper in 1930, and that he had conveyed the land to his daughter, Edith Rayborn, and her husband, Jewel Rayborn. He stated that he and the members of his family had been in actual possession of the land since the time that he purchased the same from Cooper, and had exercised control over the land, and had claimed it as their own.

Kelly Hammond testified that C. C. Morgan employed him as an attorney during the latter part of 1933 to make an abstract of title of a part of the land purchased by G. W. Morgan from the Denkmann Lumber Company, to be used in connection with C. C. Morgan's application to the Federal Land Bank of New Orleans for a loan. He identified a letter that he had written to M. L. White

on December 14, 1933, concerning a deed that had been executed by Denkmann Lumber Company to G. W. Morgan, on December 4, 1933, and deposited in escrow with the Columbia bank to be delivered upon the payment of the sum of $500, and in which the Denkmann Lumber Company had reserved title to all oil, gas and other minerals, and also a letter written by him to M. L. White dated December 29, 1933, in which he stated to M. L. White that, unless Mr. Morgan got a deed conveying to him at least one-eighth of all oil, gas and other minerals, it would be impossible for him to get a loan from the Federal Land Bank. Hammond stated that C. C. Morgan had employed him to make the abstract and he never talked to G. W. Morgan about the matter, and was quite sure that G. W. Morgan did not know anything about the writing of the above mentioned letters. He did not know whether C. C. Morgan knew about the letters or not. Hammond stated that, so far as he could recall, he never saw the deed from the Denkmann Lumber Company to G. W. Morgan, dated January 11, 1934, or the deed of trust that C. C. Morgan executed to the Federal Land Bank. He said that at that time he was trying to consummate the loan for C. C. Morgan, and that he knew nothing about oil and gas or that it had any value.

Sebe Dale, the local correspondent of the Federal Land Bank of New Orleans, testified that he disbursed the proceeds of the $590.77 loan made by the Federal Land Bank to C. C. Morgan on March 9, 1934. He said that he saw to it that the deed from the Denkmann Lumber Company to G. W. Morgan was obtained from the bank and filed for record at the time the Federal Land Bank loan funds were disbursed. He was asked whether G. W. Morgan knew anything about these transactions, and he stated that he could not say that G. W. Morgan ever saw the deed from the Denkmann Lumber Company. The deed was sent to the bank and put in escrow; and Dale took it to the chancery clerk's office for recordation along

with the C. C. Morgan deed of trust to the Federal Land Bank. Dale stated that Mr. Hammond represented C. C. Morgan in the closing of the loan.

M. L. White testified as the chief witness for Denkmann Lumber Company. He stated that he was employed by Denkmann Lumber Company on May 1, 1929, and served as land agent for the company until May 1, 1936. He succeeded L. C. Baker who had died on April 22, 1929. White testified that his ledger entries showed that G. W. Morgan had paid the interest on the two $300 notes owing by him to the Denkmann Lumber Company in 1929, 1930, 1931 and 1932, but the ledger showed no payments of principal on said notes. He stated that he was handling many items of a similar nature for the Denkmann Lumber Company, and that where the purchasers of land were unable to meet the annual payments falling due during those years, the understanding that he had with them was that they should pay the interest and taxes, and that the installments of principal becoming due would be carried over until the next fall, but, if the purchasers failed to pay the interest and taxes, the contract would be cancelled. He stated that a part of the taxes on the G. W. Morgan land for the year 1932 were not paid when due, and in September 1933 Denkmann Lumber Company paid the delinquent taxes, and cancelled Morgan's contract. White produced two delinquent tax receipts, one receipt for the sum of $29.14 and another receipt for the sum of $4.80. J. L. Thornhill's name appears on the $29.14 receipt, but the receipt was marked paid by Denkmann Lumber Company. White said that when he had to pay the taxes to protect the company's equity, "That's when the contract was cancelled."

White stated that after some negotiations,—"I don't remember just what, I don't know just what was said or done because it has been so long ago,"—it was finally agreed that the Denkmann Lumber Company would make

Mr. Morgan a deed to the land, and the company agreed to sell him the land for $500. A deed was then prepared. White stated that his instructions at that time were to reserve all of the oil, gas and other minerals. He prepared the deed and sent it to the Citizen's Bank at Columbia to be held in escrow and delivered to Morgan upon the payment of the $500 net to the company. A few days later he received a letter from Kelly Hammond dated December 14, 1933, in which Kelly Hammond said: "Mr. G. W. Morgan stated to me that his bond for title with your Company calls for a warranty deed when said purchase price has been paid. As he is not satisfied with the deed that you sent him a few days ago, for the reason you made certain reservations, and unless said reservations are removed from said deed I don't think he will be able to get his loan from the Government. I just wonder if it is possible for you to get him a warranty deed without any reservations." White replied to Kelly Hammond's letter on December 22, 1933, and in his reply stated that the original contract with G. W. Morgan had been cancelled, on account of the violation of the provisions of the contract relating to the payment of taxes. And White, in his letter to Hammond, said: "After that, Mr. Morgan began negotiating with me and I agreed to give him a deed to this land if he would pay us, I believe, $500.00. When I wrote the deed I embraced certain reservations which you speak about. At the time the original contract was written, we did not include these reservations, but later the Directors of the Company directed me to embody in all contracts and deeds these reservations."

White was asked by the appellants' attorney whether Mr. Morgan knew that the contract had been cancelled. He stated that his recollection was that when he talked with Mr. Morgan, Mr. Morgan understood that the contract had been cancelled. White then identified a copy of the letter written by Kelly Hammond to Mr. White

dated December 29, 1933. He stated that after he received that letter the Denkmann Lumber Company agreed to execute a new deed conveying to Morgan one-eighth of the minerals but reserving to the company the remaining seven-eighths of the minerals. The revised deed was then executed and sent to the Columbia bank and the company received in due course the $500 which the company had agreed to accept.

W. H. Giles, vice president and comptroller of the Denkmann Lumber Company, testified that the mineral rights on the above mentioned 220 acres of land were assessed to Denkmann Lumber Company for the years 1939 to 1945; and that the ad valorem taxes were paid for each of those years, and also for the year 1946; and that, prior to January 1, 1947, Denkmann Lumber Company made application for ad valorem tax exemption under House Bill No. 868, Laws of 1946, covering their mineral interests in Marion County, including the above mentioned 220 acres of land.

It was expressly stipulated that the records in the chancery clerk's office did not show that the contract entered into by and between G. W. Morgan and Denkmann Lumber Company, dated February 26, 1927, had ever been cancelled of record.

The chancellor, after hearing the testimony, took the case under advisement, and sometime thereafter filed a written opinion, in which he stated his findings of fact and his conclusions of law.

The chancellor held that the extensions of time for the payment of the last two installments of the purchase price of the land granted by Denkmann Lumber Company to G. W. Morgan constituted a waiver of the forfeiture provisions of the contract, and that the attempted cancellation of the contract under the circumstances testified to by White was wholly ineffective. The chancellor found that G. W. Morgan knew nothing about the negotiations concerning the mineral reservations that had

been carried on by Attorney Kelly Hammond with M. L. White and Denkmann Lumber Company prior to the execution of the deed dated January 11, 1934, and that G. W. Morgan and his grantees were not estopped from obtaining the relief prayed for in the bill of complaint. The chancellor found that, under the contract of sale, G. W. Morgan was entitled to have conveyed to him the minerals as well as the surface rights in the 220 acres of land, and that by virtue of the provisions of that contract G. W. Morgan and his grantees were the owners of the oil, gas and minerals in and on said land; and the chancellor ordered that the reservation of a seven-eighths interest in the oil, gas and other minerals contained in the above mentioned deed be cancelled.

A decree was accordingly entered in favor of the complainants, adjudging that they were the owners, in fee simple, in separate parcels of the above mentioned 220 acres of land, including all minerals, subject, however, to an oil, gas and mineral lease executed by the said parties, on November 15, 1951, to the Humble Oil and Refining Company. And in the decree it was ordered that the attempted reservation of the seven-eighths oil, gas and mineral interest, in the deed of the Denkmann Lumber Company to G. W. Morgan, dated January 11, 1934, be eliminated from the deed; and it was further ordered that the mineral deed executed by the Denkmann Lumber Company to its stockholders on December 15, 1942, and the mineral lease executed by the grantees in said mineral deed in favor of Rolin V. Hill, Jr., on September 23, 1943, and the assignment thereof to the Humble Oil and Refining Company, be cancelled.

From that decree the defendants have prosecuted this appeal.

The first point argued by the appellants' attorney as ground for reversal of the decree of the lower court is that the court erred in holding that the attempted cancellation of the original contract by Denkmann Lumber

Company during the fall of 1933, because of the failure of G. W. Morgan to pay the 1932 taxes, was ineffective. But we think that under the facts disclosed by the record in this case the court could not have held otherwise. It would be manifestly inequitable and unjust for the court to hold that Denkmann Lumber Company, after granting several extensions of time for the payment of the balance of the purchase price, and after encouraging G. W. Morgan to spend large sums of money over a period of years in making improvements on the land, could declare the contract ended and deprive Morgan of all interest in the land, merely because of his failure to pay the $34.04 taxes then due, without giving Morgan reasonable notice of its intention to cancel the contract and a reasonable opportunity to pay the balance of the indebtedness then remaining unpaid. The company had a right to demand payment of the balance of the indebtedness, because of Morgan's failure to pay the $34.04 taxes, when due, if it desired to do so. But the company had no right to declare the contract ended without notice to Morgan and without offering to perform its part of the contract.

The law looks with disfavor upon forfeitures of all kind, and when a default occurs in a case of this kind, the seller must act promptly or he will be deemed to have waived his right to declare the contract at an end. As stated by the Court in the case of Gannaway v. Toler, 122 Miss. 111, 84 So. 129: ''The rule seems to be well settled in all jurisdictions that the vendor, who has the whiphand in the optional contract of forfeiture, must exercise his option promptly after default is made by the vendee; otherwise his failure to do so is taken to evidence his purpose of continuing the contract, which amounts to a waiver of his right to declare a forfeiture.'' And it is also well settled by the decisions of this Court that, where the vendor has granted indulgence to the vendee for an indefinite time, as in the case that we have here, the vendee can be placed in default only by a demand

upon him for the payment of the balance of the purchase price and an offer on the part of the vendor to perform his part of the contract. Stewart v. Gates, 30 Miss. 100; Hines v. Baine, Smedes & M. Ch. 530; Arther et al. v. Pearson, 32 Miss. 131; Burroughs v. Jones et al., 79 Miss. 214, 30 So. 605; Ratliff v. Jackson, 151 Miss. 486, 118 So. 418.

In the case of Hines v. Baines, supra, the complainant sued for specific performance of a contract to convey land. Bryant, the seller, had attempted to rescind the contract and resell the land to another person. Bryant insisted that time was of the essence of the contract and that the notes which represented the deferred installments of the purchase price had not been paid, and that he had a right to cancel the contract and sell to another. But the chancellor thought otherwise and decreed specific performance of the contract, and in his opinion said:

"I think that Bryant was not at liberty to elect to consider the contract rescinded. Although a contract may be rescinded by one party in pais, yet, where such is his intention, he must give notice of it, and must put the other party in default by offering to comply fully with his part of the contract. In this case, the covenants are mutual and dependent, and before Bryant could absolve himself from the contract, he was bound to have tendered a deed, or at least offered to convey upon the purchase money being paid. Hudson v. Swift, 20 John Rep. (N. Y.) 27.

"There is nothing in the case going to show that there was either an offer to convey title, or that there was a demand of payment of the purchase money, or that the complainant had any notice of the intention of his vendor to abandon or rescind the contract."

In the case of Arther et al. v. Pearson, 32 Miss. 131, the Court held that the vendor who had executed a title bond, conditioned to convey title upon the payment of the purchase money, cannot, upon the purchase money fall-

ing due and remaining unpaid, rescind the contract by a mere notice to the vendee that the contract is at end, and the Court in its opinion said:

"It will be seen by reference to the title bond, that the covenants of the parties are mutual and dependent, to-wit, the payment of the money and the conveyance of the title were to be concurrent acts; and it follows hence, that neither could place the other in default in performing the contract, without an offer on his part likewise to perform. The purchaser was not bound to part with his money without the title, nor was the vendor, in his turn, bound to part with the title without the money. The only question, therefore, to be considered is, whether the notice given by the vendor to the vendee, that the contract was rescinded or at an end, can be treated as a sufficient offer to perform. The mere statement of the question would seem to contain its appropriate answer; and so far from the notice being an offer to perform, it was clearly a declaration by the party that he did not intend to perform his covenant. He could only tender performance by offering what his covenant bound him to do."

In the case of Burroughs v. Jones et al., 79 Miss. 214, 30 So. 605, the Court held that, although time be of the essence of a contract, the penalty attending the failure of the purchaser to perform the contract within a specified time will not be enforced in equity, if the circumstances render its enforcement inequitable, and that a right to declare a forfeiture of such contract will be waived unless promptly claimed at the time of its accrual.

In the case that we have here the chancellor was justified in holding that the attempt made by the Denkmann Lumber Company to cancel the contract without notice to G. W. Morgan and without first demanding payment of the balance due under the contract and offering to perform its part of the contract, was wholly ineffective.

In view of what we have said above, it is not necessary that we discuss the question whether there was in fact any competent evidence in the record to show such attempted cancellation of the contract. G. W. Morgan testified that he never received any notice of the cancellation. No instrument of writing appears in the record to show such cancellation, and no such cancellation was entered of record in the office of the chancery court clerk at Columbia.

It is next argued that the chancellor erred in rejecting the appellants' claim that the deed executed by Denkmann Lumber Company to G. W. Morgan, in which the minerals were reserved by the Denkmann Lumber Company, was executed pursuant to a new agreement that had been made with G. W. Morgan after the alleged cancellation of the old contract, and that G. W. Morgan was bound by it. But nowhere in the record does it appear that G. W. Morgan ever agreed that Denkmann Lumber Company should have the right to reserve the oil, gas and other minerals in the land, unless it be inferred from the letter written by Kelly Hammond to M. L. White on December 29, 1933, that Morgan had agreed to such reservation. M. L. White's letter to Kelly Hammond dated December 22, 1933, shows clearly that the mineral reservation referred to in Hammond's letter of December 14 had been inserted in the proposed deed, not because G. W. Morgan had agreed to it, but because the board of directors of the company had instructed him to reserve the minerals. G. W. Morgan testified that he knew nothing about the reservation. Kelly Hammond testified that he was employed by C. C. Morgan to make an abstract of title for C. C. Morgan to enable him to obtain a loan from the Federal Land Bank; that he never talked to G. W. Morgan about the matter; and that he was quite sure that G. W. Morgan did not know anything about the letters that he had written to M. L. White. There is no proof in the record to show that Kelly Hammond was

representing G. W. Morgan at the time, or that he was authorized to represent G. W. Morgan in any negotiations for the modification of the 1927 contract; and the chancellor found that G. W. Morgan knew nothing about those negotiations.

We think that the chancellor was correct in his holding that the proof was insufficient to show that a new agreement had been entered into between G. W. Morgan and Denkmann Lumber Company, under the terms of which the company should have the right to reserve seven-eighths of the minerals, and that G. W. Morgan knew nothing about the negotiations that had been carried on between Kelly Hammond and M. L. White concerning the mineral reservation. M. L. White and his superior officers may have honestly believed that the company had a right to treat the original contract as at an end, and upon that assumption reserve the minerals when the deed was executed. But, as we have already stated, the company did not have a right to treat the original agreement as at an end in so summary a fashion.

It is next argued that, even though G. W. Morgan may not have agreed to the reservation of the mineral rights, he nevertheless accepted the deed which contained the reservation, and endorsed the check for $590.77 which represented the proceeds of the loan made by the Federal Land Bank to C. C. Morgan, and, along with the others whose names appeared on the check, signed the receipt, which Sebe Dale required them to sign when he disbursed the proceeds of the loan. But G. W. Morgan testified that he did not see the deed containing the reservation when it was withdrawn from the bank and filed for record by Sebe Dale; and Morgan's action in endorsing the check for $590.77 and signing the receipt, in connection with the closing of the loan by the Federal Land Bank to C. C. Morgan was in no sense inconsistent with his claim that he knew nothing of the mineral reservation in the deed.

It is also contended that G. W. Morgan and his grantees were estopped from asserting their claim for a cancellation of the mineral reservation, because of the fact that G. W. Morgan four years later signed two deeds of trust to the Federal Land Bank and the Land Bank Commissioner, in which references were made to the reservation, and thereby ratified the instrument which contained the reservation, and that C. C. Morgan, C. R. Morgan and C. E. Morgan likewise executed deeds of trust to the Federal Land Bank, which contained references to the reservation. But the recitals in the deeds of trust executed by G. W. Morgan and his sons to the Federal Land Bank did not operate as an estoppel against G. W. Morgan and his grantees in their suit against the Denkmann Lumber Company and its stockholders for a reformation of the deed. The Denkmann Lumber Company and its stockholders were strangers to the deeds of trust executed by G. W. Morgan and his grantees to the Federal Land Bank. And, "It is a well established principle that recitals in a deed do not operate as an estoppel when the action is not founded on the instrument or is wholly collateral to it." 19 Am. Jur., p. 626, Estoppel, par. 27. "Strangers to a deed have no right to set up its recitals as estoppels." 19 Am. Jur., p. 627, Estoppel, par. 28, and cases cited.

"A recital works an estoppel only in an action founded on the deed or brought to enforce rights arising under it; and while in a collateral action it may constitute evidence against the one party or the other, it is not conclusive." 31 C. J. S., p. 215, Estoppel, par. 37d.

The most that can be said about the recitals contained in the above mentioned deeds of trust is that they constituted evidence, but not conclusive evidence, of knowledge of the reservation on the part of the borrowers at the time they executed the deeds of trust. But G. W. Morgan did not sign the deed of trust executed by C. C. Morgan to the Federal Land Bank at the time the Denk-

mann Lumber Company's deed was delivered. G. W. Morgan never saw that deed of trust so far as this record shows, and G. W. Morgan and his sons testified that they knew nothing about the mineral reservation at the time they signed the Federal Land Bank deeds of trust. G. W. Morgan's statement that he knew nothing about the reservation, until two or three years before the suit was filed, finds support in the fact that no reference was made to the reservation in the warranty deed that he executed to C. C. Morgan at the time the Denkmann Lumber Company deed was delivered, or in the deeds that he executed to C. R. Morgan on April 27, 1934, and to C. E. Morgan on January 14, 1939.

 The appellants also argue that G. W. Morgan was negligent in failing to examine the Denkmann Lumber Company deed that had been deposited in escrow at the Columbia bank for delivery to him when the $500 was paid. But, if Morgan knew nothing about the negotiations that had been carried on by Attorney Hammond with M. L. White with reference to the mineral reservation that White had caused to be inserted in the deed—and the chancellor found that he did not know anything about those negotiations—Morgan had a right to assume that the deed that had been left at the bank for him had been drawn according to the terms of the contract of sale, and Morgan under those circumstances was under no positive duty to examine the instrument for the purpose of ascertaining whether it had been drawn in conformity with the terms of the contract.

This case, on the facts and the principles of law applicable thereto, is not unlike the case of Kilmer v. Smith, 77 N. Y. 226, 33 Am. Rep. 613. In that case the defendant Dake contracted to convey to the defendant Smith certain premises subject to certain mortgages. Smith assigned the contract to the plaintiff, Kilmer, and without the consent or knowledge of Smith or the plaintiff, Dake inserted in the deed a clause binding the plaintiff

to assume the payment of the mortgages. The plaintiff, supposing that the deed conformed to the agreement, accepted it and put it on record. The plaintiff, learning later that the clause had been inserted in the deed, brought an action against the defendant Dake and the mortgagees to have the clause stricken from the deed. The Court held that the plaintiff was entitled to the relief prayed for, and in its opinion said:

"The deed was to be drawn in pursuance of the contract, and to carry out the bargain therein expressed. It is plain that the deed goes much beyond the contract, and imposes upon the plaintiff an obligation not suggested or warranted by the terms of the agreement. It is also apparent from the contract that at the time of its execution both parties understood the difference between a conveyance subject to a mortgage, and one with an agreement to assume and pay the mortgage. To warrant the imposition of such an obligation upon the plaintiff required a new agreement or at least an assent on his part.

"In this case there is not only no finding of such agreement or assent, but on the contrary, there is a finding that there was no agreement or assent by the plaintiff or his assignor, and further that the deed was taken by the plaintiff in ignorance, and upon the supposition that it was drawn in accordance with the contract. There is evidence which sustains this finding. The case is not to be regarded as one of mutual misunderstanding or mistake, but rather as a case where one party deliberately inserted in a deed a covenant tending to his own advantage and another's prejudice, and the latter in ignorance that the instrument contains the covenant accepts it as in fulfillment of a contract which requires no such stipulation. The denial of relief in such a case would be at variance with long established doctrines of courts of equity, and a reproach to the law itself. 1 Story Eq. Jur., par. 138c."

In the case that we have here, no actual fraud was proved, but we think there was such inequitable conduct on the part of the Denkmann Lumber Company, first, in attempting to cancel the contract under the circumstances testified to by M. L. White, and, second, in inserting in the deed that was finally executed a mineral reservation which Morgan had not agreed to accept, that a case was made out which entitled Morgan to the relief prayed for in his bill. Whether the mineral reservation was inserted in the deed as a result of M. L. White's mistaken belief that the original contract had been forfeited and that Denkmann Lumber Company had a right to insert the reservation in the deed, or as a result of White's mistaken belief that Kelly Hammond had authority to bind G. W. Morgan by an acceptance of the reservation, the deed with the reservation in it did not conform to the provisions of the written contract of sale. The chancellor found that Morgan had not agreed to the reservation, and under these circumstances Morgan had a right to have the reservation cancelled.

Finally, it is argued on behalf of the appellants that the complainants are barred of their right to the relief sought in their bill because of their unreasonable delay in asserting their claim for a cancellation of the mineral reservation. But the general rule is that laches cannot be imputed to one who has the right to relief, until he discovers the fraud or mistake on which the claim for relief is based, or if he moves within a reasonable time after the discovery. 45 Am. Jur., p. 635, Reformation of Instruments, par. 82; Anno. 106 A. L. R. 1338, 1345. Laches has been defined as being not only a delay in asserting one's rights, but also such a delay as works a disadvantage to another. Comans v. Tapley, 101 Miss. 203, 57 So. 567; Smith, et al. v. Smith, et al., 211 Miss. 481, 52 So. 2d 1. And in the case of Brimm v. McGee, 119 Miss. 52, 80 So. 379, the Court held that reformation would not be denied on the ground of the alleged negligence of the

appellee where the bill to reform the deeds was promptly filed upon the discovery of the mistake and no one had been injured by the lapse of time. ██ ██ "Too, the question of laches is largely addressed to the sound discretion of the chancellor, and his decision will not be disturbed on appeal unless it is clearly wrong and amounts to an abuse of discretion." Sample v. Romine, 193 Miss. 706, 8 So. 2d 257.

We find no reversible error in the record and the decree of the lower court is therefore affirmed.

Affirmed.

All Justices concur except *Gillespie, J.,* who took no part.

---

## ON MOTION TO DISMISS APPEAL

Holmes, J.

Appellee has filed a motion to dismiss this appeal upon the ground that the appeal was not perfected within six months next after the rendition of the decree complained of.

The record discloses the following: The final decree from which the appeal is sought to be prosecuted was rendered on November 30, 1951. Notice to the court reporter to transcribe his notes for the purpose of an appeal was timely mailed on December 3, 1951, and a duly certified copy thereof was filed on December 6, 1951. By instrument appearing in the record dated February 29, 1952 and filed March 4, 1952, it is shown that the appellants had theretofore paid to the court reporter the sum of $60.00, being the amount fixed by him as the cost of the transcript, and had theretofore deposited with the clerk the sum of $100.00 in lieu of bond. The appellants thereafter paid to the clerk the sum of $219.15 on October 8, 1952 and the sum of $100.00 on December 1, 1952, which sums, totalling $319.15, ap-

pellants claim were paid to the clerk as demanded by him pursuant to his ascertainment of the cost of the transcript, such ascertainment being necessarily delayed because of difficulty in assembling and preparing the exhibits. The total cost of the transcript is shown to be $318.75. The record was filed in this court on December 11, 1952, and thus it appears that at the time the record was filed in this court the appellants had deposited with the clerk the sum of $100.00 in lieu of a bond in that amount, and had paid the total cost of the transcript.

██ ██ It is contended by the appellee, however, that the appeal should be dismissed because all of the cost of the transcript and the deposit in lieu of bond were not paid within the time allowed for perfecting the appeal.

Sec. 1162 of the Mississippi Code of 1942 provides that an appeal without supersedeas may be obtained by giving an appeal bond in the sum of $500.00, or by prepaying the cost of the transcript and giving a bond in the sum of $100.00, or depositing that sum with the clerk of the court in lieu of bond.

Sec. 1959 of the Mississippi Code of 1942 provides that "an appeal to the Supreme Court shall not be dismissed for want of jurisdiction because of a defect . . . in the bond . . . but all defects and irregularities may be cured by amendment so as to perfect the appeal and obtain the judgment of the Supreme Court in the case; but the court may dismiss an appeal for a failure of the appellant to do, within a reasonable time, what may be necessary to perfect his appeal." In construing this section, we have held that where an original appeal bond defective as to the amount was filed within the time allowed for taking the appeal, the court may grant leave to perfect the defective appeal bond after the expiration of the time allowed for taking the appeal. Lovett v. Harrison, 162 Miss. 814, 137 So. 471. In the case at bar, the appellants, within the time allowed for taking

the appeal, made the required deposit in lieu of bond and paid what was then ascertained to be the cost of the transcript. It later developed that the cost of the transcript was more, and appellant paid the additional cost as ascertained. We think the position of the appellants was analogous to a case in which the appellant had given an appeal bond which was defective in amount, and that on application they would have been entitled within a reasonable time fixed by the court to pay the additional cost of the transcript as ascertained, and perfect their appeal. Such application is not here necessary since the required amounts to perfect the appeal have already been paid. We accordingly are of the opinion that the motion to dismiss the appeal should be and it is overruled.

Motion to dismiss appeal overruled.

*Roberds, P. J.,* and *Hall, Lee,* and *Arrington, JJ.,* concur.