Alvin E. MARTIN, and Alaska National
Bank, Appellants,

v.

Florian MALDONADO, Appellee.

Florian MALDONADO, Cross-Appellant,

v.

Alvin E. MARTIN and Alaska National
Bank, Cross-Appellees.

Nos. 3049, 3090.

Supreme Court of Alaska.

Dec. 9, 1977.

Mary A. Nordale, Fairbanks, for appellants and cross-appellees.

Allen McGrath, Graham & James, Anchorage, for appellee and cross-appellant.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ and CONNOR, JJ.

RABINOWITZ, Justice.

This appeal and cross-appeal arise from a dispute involving the breach of a contract to sell a laundry business. The superior court awarded Florian Maldonado damages plus interest, costs and attorney's fees. We affirm the judgment in all respects except for two portions of the damages awarded and the resultant adjustment of attorney's fees granted.

In late 1967, Florian Maldonado and William Hagar entered into negotiations with Alvin Martin and Phyllis Martin to purchase the Martins' White Swan Laundry in Fairbanks. Maldonado is of Mexican descent and has difficulty reading and speaking English; he had been an employee at White Swan even before the Martins' acquisition of the laundry in 1960. Hagar had worked for Mr. Martin at another laundry in 1966 and began work with dry cleaning at White Swan in October 1967. On February 7, 1968, the parties entered into a written agreement which had been prepared for Martin by a local attorney, whereby the Martins, who were the sole shareholders of White Swan Laundry, Inc., agreed to sell all their stock to Maldonado and Hagar.[1] By

1. The key provisions of the agreement were outlined by the superior court in its findings of fact:

> According to the express terms of the written agreement the MARTINS agreed to sell all of their shares of stock in the WHITE SWAN LAUNDRY (representing 100% ownership) to MALDONADO and HAGAR for a 'total sales price of $407,136.31.'
>
> The 'total sales price' included the amount of an obligation owed to the American Laundry Machinery Company ($63,100.00) and one owed to the Small Business Administration ($45,000.00).
>
> It is not clear from the evidence whether the amounts owed to the American Laundry Machinery Company and/or the Small Business Administration were corporate debts owed by the WHITE SWAN LAUNDRY or personal obligations owed by the MARTINS, either as principals or guarantors for credit extended to the corporation.
>
> Under the original contract of sale MALDONADO and HAGAR agreed to:
>
> (a) Assume and keep current the $1,553.00 monthly payments on the debt owed to the American Laundry Machinery Company.
>
> (b) Assume and keep current the $255.00 monthly payments on the debt owed to the Small Business Administration.
>
> (c) During 1968, make weekly payments of $350.00 to the MARTINS totalling $18,200.00.
>
> (d) During 1968, collect, for the MARTINS, monthly rental payments of $100.00 on a house located near the WHITE SWAN LAUNDRY at 312 Wendell Street, Fairbanks, Alaska.
>
> (e) During 1968, collect for the MARTINS, monthly payments of $417.00 derived from an obligation described as the 'Fort Wainwright Contract.'
>
> (f) Make a lump sum payment, at the end of 1968, to the MARTINS, equal to the basic net profit of the corporation (WHITE SWAN) which was agreed to be the net profit before depreciation but including payments on the obligations to the American Laundry Machinery Company and the Small Business Administration.
>
> The obligations described in (c), (d), (e) and (f) of the foregoing paragraph were, according to the written contract, to 'be considered as a down payment on the $299,036.20 portion of the total purchase price due Alvin and Phyllis Martin,' with the balance thereof to be paid as follows:
>
> Payments of $350.00 per week, commencing January 1, 1969, plus interest at 4% per annum on the unpaid balance to be computed and paid monthly. Such weekly payments were to continue until the obligation to the American Laundry Machinery Company, assumed by MALDONADO and HAGAR under the agreement, had been paid off at which

its terms the agreement was to be effective as of January 1, 1968. The document was read aloud to the parties and its various provisions were discussed before it was executed.

Thereafter, Hagar and Maldonado encountered numerous difficulties in managing White Swan. Although business was growing in volume, insufficient cash flow hampered the laundry's operation. They also had personal problems working together. Martin later drafted a document entitled "Amendments to the Contract" which purported to extend the "option to purchase" until September 1, 1969, to give Martin greater control over the operations, and to create a "buy-out" feature should either Maldonado or Hagar want to leave the partnership. The agreement was signed by Martin, Hagar and Maldonado and given an effective date of November 1, 1968.

Because of the White Swan's financial difficulties, Hagar and Maldonado were unable to pay Martin the interest payment for January 1969 as required by the agreement of January 1, 1968. Martin told both men that he would let the interest payments go for awhile.

The difficulties surrounding White Swan's operation became so serious that Hagar sent Maldonado a letter on May 22, 1969, resigning his "position as manager and co-owner of White Swan Laundry." Five days later, Martin told Maldonado that he had decided to let Hagar have the business and would pay $6,000 to Maldonado. Maldonado subsequently sent Hagar a letter stating that Maldonado interpreted the May 22 letter as a termination of Hagar's interest in the laundry and that he was exercising his 90-day option to purchase Hagar's interest in the partnership for $6,650. Martin then sent Maldonado a letter dated June 4, 1969, demanding payment of $46,000 in cash by June 11, 1969, "in order to reconsider or consider a possible sale to Florian Maldonado." Martin stated:

> Due to conditions, I find myself in this position: Based on money owed (past due and payable) myself (Al Martin) by White Swan Laundry, I find it necessary to foreclose on contract dated 1–1–68 within seven days of the date of this letter.

After the deadline had passed, Martin sent Maldonado another letter which contained the following:

> Due to your inability to conform to my demands in the letter to you dated June 4, 1969 (copy enclosed), White Swan has been formally and legally foreclosed upon as of June 11, 1969. I am sorry for this action.

Maldonado filed a complaint against Hagar, Alvin Martin and Phyllis Martin. After numerous amendments and motions had been made, the only remaining defendant was Alvin Martin and the only issue to be litigated was Maldonado's breach of contract claim. Martin counterclaimed for approximately $12,000 on a theory which is not apparent on the face of the counterclaim. Martin's counterclaim was revised during trial and was increased to $35,400. After a nonjury trial, briefing and argument, the superior court entered judgment in favor of Maldonado for $72,354.82 in damages plus interest, costs and $7,500 in attorney's fees. This appeal and cross-appeal followed.

Appellant Martin raises a variety of issues going to the meaning of the agreement, mistake regarding the document executed, breach of the contract, amount of damages awarded, and alleged damages owing to him in his counterclaim. Cross-appellant Maldonado contends that the superior court erred in calculating damages. Because these issues are so diverse, we will deal with them seriatim.

■■■ Martin contends that the contract was ambiguous and that he "has a right to reform its language to conform to the parties' intentions," i. e., that the contract should be interpreted as an option contract rather than as a contract for purchase and sale. However, Maldonado was suing only

time the assumed payments to the SBA would increase by $1,553.00 per month until that debt was likewise paid off. Thereafter,

the sellers would be paid $1,553.00 per month until the total purchase price was satisfied.

for damages; recovery would be the same whether the agreement is regarded as a contract of purchase and sale or an option contract. As Professor Simpson has noted:

> Since the damages for breach of the collateral contract to keep the offer open will in any case equal the damages for breach of the principal contract had it been consummated, where damages is the remedy chosen by the aggrieved party it can make no difference to him if the collateral contract is regarded as the only contract capable of enforcement.[2]

In addition, the facts of the instant case permit this agreement to be interpreted only as a contract of purchase and sale.[3]

█ This court has previously stated that it will apply an objective standard to contract interpretation,[4] i. e., the agreement is interpreted in accordance with the reasonable expectations of the parties.[5] To ascertain the parties' reasonable expectations, we look to the language of the agreement and to relevant extrinsic evidence.[6] Although the agreement at issue in the case at bar contains some rather unusual provisions, it would be tantamount to a complete rewrite on our part to change the existing document to a lease with option to purchase. Our review of the record has persuaded us that there is no evidentiary basis calling for such a total revision. The superior court was correct in holding that the parties could not have reasonably understood the agreement to be only a lease and option to buy.[7]

2. L. Simpson, Contracts § 26, at 35 n. 33 (2d Ed. 1965).

3. Martin argues that the agreement was intended to create a lease with option to purchase. In this regard, the superior court found:

> The written agreement clearly contemplated a sale by the MARTINS of their interest in the WHITE SWAN LAUNDRY.
>
> The court finds it impossible to believe that the MARTINS or any other party to the written agreement understood such agreement to be only a lease and option to buy.
>
> All parties to the written agreement understood and intended it to be a contract for the sale of the MARTINS' interest in the WHITE SWAN LAUNDRY to MALDONADO and HAGAR.
>
> The written contract correctly states the agreement of the parties. .
>
> If there was any mistake as to the meaning of the contract, to the effect that it contemplated a lease/option rather than a sale of their interest, such was a unilateral mistake on the part of the MARTINS.
>
> . . . . .
>
> Despite the use of the term 'option' therein the court is not persuaded by such evidence or the testimony of any witness that the parties ever intended their agreement to be anything other than a contract of sale.

The superior court concluded:

> The contract was not an option agreement.
>
> . . . . .
>
> The November 1968 amendment of the contract did not convert it to a lease and option to buy. `

Review of the record persuades us that the superior court's findings on this point were not clearly erroneous, and that its legal conclusions were correct.

4. National Bank of Alaska v. J.B.L. & K. of Alaska, Inc., 546 P.2d 579, 584–85 (Alaska 1976).

5. Stordahl v. Government Employees Ins. Co., 564 P.2d 63, 65 (Alaska 1977).

6. Id. at 66; Wessells v. State, 562 P.2d 1042, 1052, n. 39 (Alaska 1977). See Tsakres v. Owens, 561 P.2d 1218, 1223 (Alaska 1977) (concurring opinion of Boochever, C. J., joined by Rabinowitz, J.).

7. The superior court's findings of fact included the following:

> The terms and conditions of the written agreement are clear and unambiguous insofar as they relate to the character of the transaction agreed to by the parties.
>
> The written agreement clearly contemplated a sale by the MARTINS of their interest in the WHITE SWAN LAUNDRY.
>
> The court finds it impossible to believe that the MARTINS or any other party to the written agreement understood such agreement to be only a lease and option to buy. _

The superior court also found that the agreement expressed the intent of the parties. Thus, it is apparent that the trial court did not believe the testimony of the witnesses for Martin. A finding of fact is reversible only if "clearly erroneous," i. e., although there may be evidence to support it, the reviewing court is left with the definite and firm conviction on the entire record that a mistake has been committed. E. g., State v. Abbott, 498 P.2d 712, 727 (Alaska 1972); Alaska Foods, Inc. v. American Mfr.'s Mut. Ins. Co., 482 P.2d 842, 848 (Alaska 1971). We have reviewed the entire record and believe there is adequate evidentiary support

Also without merit is Martin's contention that the amendments of November 1, 1968, modified the original agreement, thus making it a lease with option to buy.[8] Even assuming sufficient consideration for the amendments,[9] their provisions contain nothing which would change any part of the original contract except its date. The basic "sale" character of the initial agreement remained unaffected.[10] Given the parties' confusion about the meaning of the word "option," [11] we hold the effect of the amendment was to enlarge the time in which the down payment was to be made. Accordingly, we conclude that the superior court did not err in its treatment of the amendments.

Martin contends that the superior court erred in holding that there was no mutual mistake. A mutual mistake is normally one that is common to all parties to the agreement and reformation is applied to conform the agreement to the parties' intentions.[12] Here the superior court accepted Maldonado's testimony that he believed the agreement was for the purchase and sale of stock in White Swan Laundry—not for a lease with option to buy. Since our review of the entire record convinces us that the superior court's controlling findings on this issue were not clearly erroneous, we find no merit in this specification of error.

Martin argues further that the agreement should be rescinded because of his unilateral mistake.[13] Relief grounded on unilateral mistake is appropriate when

for the superior court's conclusion and are of the further view that this conclusion could have been based on the superior court's evaluation of the demeanor of the witnesses. Thus, we are not left with a definite and firm conviction that a mistake has been committed.

8. In paragraph 1 of the amendments it is stated:

Option to purchase White Swan Laundry, Contract Dated 1/1/68, to be extended to 9/1/69.

The superior court found as a matter of fact:

Despite the use of the term 'option' therein the court is not persuaded by such evidence or the testimony of any witness that the parties ever intended their agreement to be anything other than a contract of sale.

The court held:

The November 1968, amendment of the contract did not convert it to a lease and option to buy.

9. In *Holiday Inns of America, Inc. v. Peck,* 520 P.2d 87, 94 n. 19 (Alaska 1974), this court noted that consideration was required for an amendment or modification of a contract not for the sale of goods. As announced in *Swindel v. Kelly,* 499 P.2d 291, 296 n. 17 (Alaska 1972):

The usual test for valuable or sufficient consideration is whether the promise involved a detriment incurred by the promise[e] or a benefit accruing to the promissor at his request. (citations omitted)

10. The terms of the original contract that are not changed by the modification or amendment continue and become a part of the substituted contract, except where inconsistent with the modification. *See* L. Simpson, Contracts § 97, at 193 (2d ed. 1965).

11. Mrs. Martin's interpretation would have created not a lease with option to buy but a lease with invitation to offer to purchase. Hagar explained that the January 1, 1968, document was an option because the word is used in the first full paragraph of page 2 with respect to the partnership survivorship buy-out provision. Hagar did not regard the word "option" in its legal connotation (irrevocable offer). He viewed the one year period as a trial period for Maldonado and him to prove themselves.

12. *See, e. g.,* 13 W. Jaeger, Williston on Contracts §§ 1535, 1547 (3d ed. 1970).

The Restatement of Contracts § 504 (1943) states, in part:

[W]here both parties have an identical intention as to the terms to be embodied in a proposed written conveyance, assignment, contract or discharge, and a writing executed by them is materially at variance with that intention, either party can get a decree that the writing shall be reformed so that it shall express the intention of the parties, if innocent third persons will not be unfairly affected thereby.

13. Martin does not address the issue of damages had the agreement been rescinded. According to Professor Corbin, the parties should be restored to their original positions. 3 A. Corbin, Contracts § 607, at 662 (1960). In this case, that was essentially the measure of damages, since Maldonado was awarded only his expenses of performance. Thus, even if the court were to rule that the contract should be rescinded for unilateral mistake, the matter would not be reversed.

enforcement of the contract would be unjust.[14] As stated by Professor Corbin:

> There is practically universal agreement that, if the material mistake of one party was caused by the other, either purposely or innocently, or was known to him, or was of such character and accompanied by such circumstances that he had reason to know of it, the mistaken party has a right to rescission.[15] (footnote omitted)

■ Since the contract in this case was drafted at the request of Martin's accountant, Maldonado cannot be said to have "caused" the mistake. The superior court specifically found that Maldonado was not aware of any mistake on the part of the Martins. Thus, if Martin is to be granted rescission it must be because Maldonado should have known of the error. However, the superior court also found that Maldonado had no reason to suspect that the contract did not express the intent of Martin. Once again our reading of the record does not leave us with the conviction that either of these findings of fact is clearly erroneous. Thus, the court's decision to deny rescission must be upheld.

■ Martin also argues that Maldonado was in material breach of the contract due to a variety of alleged failures.[16] Assuming without deciding that there was a material breach, the record adequately supports the superior court's finding that Martin told Maldonado and Hagar the interest payments could be "let go" for awhile and that Martin did not demand payment from Maldonado until he sent the letter of June 4, 1969, to Maldonado. Martin's actions constituted a waiver which excused Maldonado's non-performance—at least until proper demand was made.

The doctrines of election and waiver are firmly established in the law. Professor Williston has stated:

> The principle is general that wherever a contract not already fully performed on either side is continued in spite of known excuse, the defense thereupon is lost and the injured party is himself liable if he subsequently fails to perform, unless the right to retain the excuse is not only asserted but assented to.[17] (footnotes omitted)

Martin could have asserted Maldonado's breaches had he made a proper demand. At the point he made such demand, Maldonado would have been put on notice that Martin now considered time to be of the essence and was no longer electing to continue the contract.[18] The notice to Maldonado, however, demanded payment of $46,000, even though the only amount which could have been legitimately demanded under the terms of the contract was the interest.[19] Thus, no proper demand for payment

---

**14.** 3 A. Corbin, Contracts § 610, at 696 (1960).

**15.** *Id.* at 692.

**16.** Martin maintains:
> He [Maldonado] was five months behind in his interest payments, he failed to pay the first ten weekly payments, and failed to pay installments on long term indebtedness (SBA and American Laundry loans), he failed to maintain and keep operable the equipment in the laundry and he attempted to abandon the premises by stating he was going on a five-week vacation in peak season.

**17.** 5 W. Jaeger, Williston on Contracts § 688, at 300 (3d ed. 1961).

**18.** *See, e. g., Dempsey v. Stauffer*, 312 F.2d 360, 362–63 (3d Cir. 1962); *Lopez v. Bell*, 207 Cal.App.2d 394, 24 Cal.Rptr. 626, 629 (1962); *Denkman Lumber Co. v. Morgan*, 219 Miss. 692, 69 So.2d 802, 810 (1954); *Finn v. Glick*, 42 N.J.Super. 514, 127 A.2d 204, 206–07 (1956). *See also Dillard v. Ceaser*, 206 Okl. 304, 243 P.2d 356, 358 (1952).

**19.** The superior court's Finding 38 listed the items within the $46,000 total demanded by Martin:

| | |
|---|---|
| Martin's costs for machinery rehabilitation | $15,000.00 |
| Martin's costs for service rendered by a Mr. Temlin | 1,500.00 |
| Martin's costs for a fire alarm system | 1,500.00 |
| Martin's costs for animal protection | 1,000.00 |
| Interest owed and past due | 6,000.00 |
| Moneys owed and past due to Coin King | 1,500.00 |

was made; and the superior court's holding that Martin had waived Maldonado's breach must be affirmed.

Appellant Martin additionally contends that the inability of Maldonado to perform, *i. e.*, the insolvency of the corporation and Maldonado's alleged failure to offer evidence of his ability to perform in the future, entitled Martin to terminate the subject contract. Even if the rule sought by Martin were applied,[20] there has been no adequate showing of Maldonado's inability to perform. Maldonado proved to the satisfaction of the superior court that he could

| | |
|---|---|
| Moneys owed Martin for sale of two Milnor machines | 1,500.00 |
| Moneys owed Martin for sale of three Speed Driers | 900.00 |
| Moneys owed Martin for sale of Water Softner | 500.00 |
| Moneys owed Martin for 250 cases of hangers | 3,000.00 |
| Six months principal payment in advance | 9,100.00 |
| Six months interest payments in advance | 4,500.00 |
| TOTAL DEMAND | $46,000.00 |

In Finding 42, the superior court further noted:

> On the date of MARTIN'S demand the amount of interest past due and owing under the contract was substantially less than the $6,000.00 amount demanded, being only $4,000.00.

20. Although we have rejected Martin's contention based upon his failure to show that Maldonado would have been unable to perform, we do not adopt the rule suggested by Martin. Professor Williston notes that a party may be excused from performing "[i]f it is clear that one party to a contract is going to be unable to perform. . . ." 11 W. Jaeger, Williston on Contracts § 1308, at 100 (3d ed. 1968) (footnote omitted). Martin did not cease performing; instead, he attempted to terminate the contract. Rather than approving a rule which allows termination when one party to an executory contract is insolvent and credit has been extended, we think the better rule would permit the other party to suspend performance until security or assurance is given. *See* L. Simpson, Contracts § 166, at 342 (2d ed. 1965). For example, in contracts for the sale of goods, a party who has reasonable grounds for believ-

have cured the breach on proper demand. Business volume was increasing, and losses were decreasing.[21] In such circumstances, prospective inability to perform on Maldonado's part was not established.[22]

Martin argues that the superior court's findings 32 and 55 are clearly erroneous and that conclusion of law 21(a) is incorrect. Finding 32 indicates that the Martins were paid $72,354.82 by the purchasers.[23] Finding 55 includes a statement that the cost of completing the contract was only $226,681.38.[24] Martin contends a larger amount

ing that the other party will not be able to perform, may demand adequate assurances and suspend performance until assurances are given. U.C.C. § 2–609, AS 45.05.178. However, such a rule would not have benefitted Martin on the instant facts; except for placing the stock in escrow, he had no further contractual duties to perform.

*Northern Corp. v. Chugach Elec. Ass'n*, 518 P.2d 76, *modified on rehearing*, 523 P.2d 1243 (Alaska 1974), cited by Martin in support of his "impossibility" argument, recognized the doctrine of "commercial impracticability," *i. e.*, a party may be discharged from his or her duty to perform under the contract "if the costs of performance would be so disproportionate to that reasonably contemplated by the parties as to make the contract totally impractical in a commercial sense." 518 P.2d at 81. The situation in the case at bar does not resemble a case of commercial impracticality.

21. Martin did show that White Swan was insolvent in both the bankruptcy and accounting senses. However, Maldonado was the contracting party rather than White Swan; he was not shown to be insolvent.

22. As Professor Corbin has noted, proof of insolvency alone is not sufficient to establish prospective inability to perform. 6 A. Corbin, Contracts § 1261, at 38–39 (1962).

23. Finding 32 reads:

> Between January 1, 1968, and May 31, 1969, MALDONADO and HAGAR paid $72,354.82 to the MARTINS under the contract of sale.

24. Finding 55 reads:

> Assuming that MALDONADO'S cost of completing the contract was only $226,681.38 (and not $334,781.49 as it would have been if he owed a personal obligation to the MARTINS to pay off the $45,000.00 owed to the Small Business Administration and the $63,100.11 owed to the American Laundry Machinery Company) the proof fails to establish

was due on the contract and a sum smaller than $72,254.82 had been paid. He also objects to Conclusion of Law 21(a) which indicates Maldonado's payment of $72,-354.82.[25]

Based on our reading of the entire record, we affirm Finding 55's conclusion that the cost of completing the contract exceeded the fair market value of White Swan. However, we think the cost of completion figure ($226,681.38) is too low because the superior court's calculation of the amount paid by Maldonado was too high; the reasons for our conclusion are set forth below. That error does not affect the correctness of Finding 55, and we conclude that Finding 55 was not clearly erroneous.

The superior court's Findings 31 and 32 are in conflict in light of the evidence presented.[26] Finding 31 indicates that no lump sum payment was made to the Martins at the end of 1968. Finding 32 can be correct only if a sum representing profits was paid at the end of 1968 and was included in the $72,354.82 figure. Accordingly, Findings 31 and 32 are in conflict in light of the evidence presented. We hold that Finding 32 is clearly erroneous for reasons discussed below. Finding 31 and corrected Finding 32 require an adjusted calculation of the dollar amount appearing in Conclusion of Law 21(a).

 The superior court's finding that Maldonado and Hagar had paid $72,354.82 to Martin under the contract was based on figures shown in the books and records of the White Swan Laundry. However, Sharon Pendley, the company's bookkeeper testified that the figure was based on incorrect entries, i. e., that $20,704.82—the amount entered for the down payment based on net profit for 1968—should not have been entered.[27] Pendley explained that she had miscredited these amounts because she had misunderstood the contract of sale. Based on her revised reading of the contract, the following amounts should have been applied as reducing the contract indebtedness:

Weekly payment of $350.00
312 Wendell St. rental ($100/month)
Ft. Wainwright contract ($417/month)

She also testified that Martin was paid a total of $21,800. She did not clarify what credited items comprised the difference between the $51,650 figure[28] and the $21,800 figure, except to say that she had credited the payments to the American Laundry Machinery Company and the Small Business Administration on long-term indebtedness to the Martin contract. Since the $20,-704.82 entered as down payment representing net profit was never made, the superior court's award of damages insofar as it includes this sum is inaccurate and must therefore be modified.

 The superior court awarded $72,-354.82 as the amount of "all moneys paid to the Martins under the contract." Among the items which apparently went into this figure were payments of long-term indebtedness which Maldonado and Hagar had

by a preponderance of the evidence that the fair market value exceeded that amount. Quite the contrary, the proof tends to establish that the cost of completing the contract far exceeded the fair market value of the WHITE SWAN LAUNDRY.

**25.** Conclusion of Law 21(a) states that Maldonado is entitled to an award of damages in the amount of $72,354.82.

**26.** Finding 31 reads:
There was no lump sum payment made to the MARTINS at the end of 1968, of the basic net profits of the corporation, because there was no net profit.
Finding 32 appears in note 23, *supra.*

**27.** The superior court found that the "down payment" was to consist of four separate items, one of which was to be the corporation's basic net profit for 1968 (i. e., net profit before depreciation including payments on obligations to the American Laundry Machinery Company and the Small Business Administration). *See* note 1, *supra.*

Each testifying witness who had knowledge of the transactions beyond what was recorded in the books stated that the $20,704.82 had not been paid. The reason for it not being paid was that no net profit for 1968 remained when it was calculated according to the contract. The superior court also found that no net profit existed.

**28.** The $51,650 figure represents the difference between the $72,354 figure shown on the books to have been paid, and the $20,704 entered for the 1968 net profit which was not actually paid.

expressly assumed in the contract. We have concluded that on the facts appearing in this record the superior court's inclusion of a portion of such payments was correct. Except where specific contract provisions show that such payments should be considered part of the purchase price, long-term indebtedness of a closely held corporation is not a cost of performing the contract for purchase of its stock. This is because the contract for sale of stock in a closely held corporation may provide for a transfer of stock without specifying that payment of long-term indebtedness is part of the purchaser's obligation. In such situations the corporation remains liable for its obligations, but the debts are owed by the corporation because of its relationship with creditors rather than by the buyer because of the purchase agreement. Repayment of the indebtedness is then merely a cost of the overall operation. However, where the contract has specified that payment of such indebtedness is part of the contract price, a different situation exists; it is appropriate to include the payments as part of the buyer's cost of completing the contract. Since the agreement in the case at bar specifically required the buyers to repay long-term indebtedness as part of their performance, we have determined that the superior court properly considered such payments in calculating the amount paid by Maldonado under the contract.

However, an increase in Martin's equity in White Swan was produced only by that portion of the required monthly payment on each debt which corresponded to reductions of principal. The other payment portions—representing interest—are as much an expense of doing business as any other incurred in operating White Swan Laundry. Such payments reflect the cost of the corpo-

rations' using long-term loans to generate income after Maldonado's purchase; during the same period, Maldonado received the benefit of White Swan's income—derived in part from such loans. Accordingly, we conclude that only the amount paid on principal should be recoverable. On remand, it will be necessary for the superior court to calculate the portion of monthly payments attributable to principal.

By way of summary, we conclude, based upon the superior court's findings of fact (omitting erroneous Finding 32), that the award of damages to Maldonado properly included the full book amount paid, less (1) the "net profit" figure and (2) the portion of payments on long term indebtedness representing interest. Thus, the superior court's award of damages should be corrected by subtracting from $51,650 those portions of payments made to the American Laundry Machinery Company and the Small Business Administration which correspond to interest on long-term indebtedness.[29] In light of our holding that the amount of damages must be redetermined, the superior court's reconsideration of attorney's fees is also necessary.

■■■ In regard to the superior court's award of damages in general, Martin also argues that the amount of damages should be reduced by one-half, since the contract called for Maldonado and Hagar to "own all of the said stock jointly, share and share alike." We note that Hagar's letter of May 22, 1969, notified Maldonado that he "resign[ed] [his] position as manager and co-owner of White Swan Laundry." Hagar's letter of June 4, 1969, was an even clearer repudiation of the partnership.[30] The partnership had been terminated prior to the

---

29. The $51,650 figure is derived in the following manner:

| | |
| --- | --- |
| Contract amount | $299,036. |
| Less: Book amount owing on contract | 226,681.38 |
| Book amount paid | 72,354.82 |
| Less: Net profit figure | 20,704.82 |
| | $ 51,650.00 |

30. In Finding of Fact 36, the superior court noted:

On June 4, 1969, HAGAR wrote to MALDONADO indicating that he did not want to sell his equity in the WHITE SWAN but that his 'resignation was tendered to disassociate [himself] with [MALDONADO];' HAGAR apparently abandoning his interest in the contract and the WHITE SWAN LAUNDRY. Hagar's letter of June 4, 1969, should not be

time of the breach; Maldonado did not receive Martin's letter dated June 4, 1969, until June 5. Accordingly, the superior court was correct in awarding the full amount of damages to Maldonado.

Martin counterclaimed for damages in the superior court based on a variety of items, including repairs to equipment ($18,000), corporate debts owed to Martin ($11,400), and damages for Maldonado's breach of the agreement ($6,000).[31]

■ The general rule is that a shareholder has no personal or individual right of action against third persons for acts producing injury to the corporation and thereby making the stock less valuable, since the harm suffered by the individual shareholder is merely incidental to the wrong suffered by the corporation.[32] Martin recognizes this rule; but asserts that he falls within an exception because the injuries suffered were also personal ones arising out of a special duty owed to the shareholder by the wrongdoer.[33]

■ We conclude that no error was committed in denying recovery on the counterclaim. With respect to the $11,400 of debts owed to Martin, the record adequately supports the superior court's conclusion that the money was owed to Martin solely by the corporation if it was owed at all. As to the $6,000 claim, Martin failed entirely to prove what constituted the claim. The claim for $18,000 in damages for repair of machinery at White Swan is also flawed. There is nothing in the relationship between Martin and Maldonado which would allow Martin to sue individually for this alleged corporate harm, i. e., no special duty was owed to Martin by Maldonado which would bring Martin within the exception noted previously.[34]

Maldonado contends on cross-appeal that his damages should have been based upon the difference between the fair market value of the White Swan Laundry and the cost of complete performance; his first specification of error attacks the superior court's finding that the evidence failed to establish that the fair market value of White Swan Laundry exceeded the cost of complete performance. He argues that the fair market value of the laundry as determined by the parties on the date of sale was $407,136.31, less the assumption of long-term debt, for a total of $299,036.20. He also notes that the value of the laundry had increased because of increased production and a turn-around in the earning figures. Thus, he concludes, the court's finding that on the date of breach the laundry was essentially valueless is clearly erroneous; and, therefore, he should be entitled to a larger amount of damages than the amount awarded by the superior court.

confused with Martin's letter dated June 4, 1969.

**31.** The superior court denied any recovery on the counterclaim, finding (1) Martin failed to establish by a preponderance any facts showing a right of recovery; (2) Martin's expenditures, if made, were performed for the corporation without any agreement, express or implied that Maldonado would be personally liable; (3) the damage alleged was done to the corporation or to corporate property; and (4) Martin had not demonstrated a theory under which he was entitled to recover damages on his counterclaim.

**32.** E. g., Sutter v. General Petroleum Corp., 28 Cal.2d 525, 170 P.2d 898, 900–01 (1946); Weiss v. Northwest Acceptance Corp., 274 Or. 343, 546 P.2d 1065, 1069 (1976); Annot., 167 A.L.R. 279, 280 (1947).

**33.** The exception is recognized in, e. g., Schaffer v. Universal Rundle Corp., 397 F.2d 893, 896 (5th Cir. 1968), and Sutter v. General Petroleum Corp., 28 Cal.2d 525, 170 P.2d 898, 901 (Cal.1946). See also Annot., 167 A.L.R. 279, 285 (1947).

**34.** The rule against individual shareholder suits also applies where a single individual is the sole stockholder unless there is a violation of a duty owed directly to him. Schaffer v. Universal Rundle Corp., 397 F.2d 893, 896 (5th Cir. 1968). We conclude that protection of White Swan's creditors demands application of the general rule. That is, any damage recovery should go directly to the corporation; a shareholder's derivative suit or a direct corporate suit would thus be required.

The testimony adduced at trial on the issue of the fair market value of White Swan Laundry on the date of breach came primarily from two experts, Robert L. Murray, a certified public accountant for Maldonado, and Benjamin M. Perles, an economist for Martin. Murray derived a fair market value of $640,000 based on a combined cash flow and net income capitalization analysis. The court found that such a value was not believable and that it was based on insufficient data.[35] Perles considered several possible methods for valuing the business: capitalized earning power, good will or going concern value, market value, investment value, book value, cost less depreciation, reproduction costs and substitution costs. Since some of these methods did not fit the situation, not all were employed. Perles concluded that the laundry business lacked value under each separate method of analysis he applied. He concluded that "[b]y any reasonable economic standard, the firm must be considered valueless as of [the date of breach]." He qualified that statement by saying that it did have value to a person willing to gamble his or her time and money.

The weight to be accorded an expert's opinion is within the province of the trier of fact.[36] The amount remaining to be paid to Martin under the contract was at least $226,000. Other than Murray's testimony, which was not considered persuasive, the only other testimony of value at the time of breach was an affidavit submitted early in the case by Martin (in opposition to appointment of a receiver) in which he stated "my wife and I have an interest in

excess of $400,000 in the business." There was no evidence adduced at trial that the parties had negotiated the contract price. Perles testified that in his opinion the $407,-000 contract price was excessive when the contract was executed. The business showed losses totalling over $89,000 in the preceding three years. In such circumstances, the agreed price can hardly be viewed as a reasonable approximation of White Swan's value. Where a buyer makes an exceptionally bad bargain, the market value at date of breach could easily be lower than the cost of performance—even though business production had increased during the interim. Thus, we hold that the superior court's finding as to value was not clearly erroneous.

Maldonado also contends that the court erred in calculating the amount of damages to be awarded as measured by his actual expenses of performance. He argues that an additional $30,800 should be added to account for the payments on long-term indebtedness. Maldonado has apparently overlooked Pendley's testimony that the $72,000 amount included payments for long-term indebtedness. We have already discussed the inclusion of the payments for long-term indebtedness and have approved a portion of this item as part of the damages properly recoverable by Maldonado.

Maldonado also notes that the superior court did not award an amount for unpaid labor. As Professor Corbin has noted, such an amount is often awarded when damages are measured by the amount spent in part

---

**35.** Murray testified that White Swan's intrinsic value on June 1, 1969, was $640,000. The superior court's Finding 50 indicates that Murray had valued the laundry at $646,000 as of June 4, 1964. Despite these discrepancies, the record and findings of fact demonstrate that the superior court assessed the expert testimony in relation to the date of breach and found that such a large estimated value was not believable. The $6,000 variation between Murray's testimony and Finding 50 could not have affected the superior court's additional finding that White Swan Laundry was essentially valueless on the date of breach. Finding 51 explains:

Such evidence [i. e., Maldonado's evidence of value] was based on insufficient data to permit this court to rely on the opinion of plaintiff's expert; the court considers such evidence extremely unreliable and speculative in nature.

**36.** State v. Phillips, 470 P.2d 266, 272 & n. 18 (Alaska 1970). See Haisley v. Grant, 486 P.2d 367, 370 (Alaska 1971); see also Early v. United States, 474 F.2d 756, 758 (9th Cir. 1973); Davis v. Chism, 513 P.2d 475, 485 (Alaska 1973).

performance.[37] Nevertheless, Maldonado offered no proof as to what such amount should be. He did not testify that his duties had changed greatly after the purchase of White Swan or that he was being paid less than the value of his services. We conclude that the court below did not commit error.

The case is remanded to the superior court for entry of judgment in accordance with this opinion and for redetermination of attorney's fees. In all other respects, the superior court's judgment is Affirmed.

BURKE and MATTHEWS, JJ., not participating.

---

37. 5 A. Corbin, Contracts § 1031 (1964).