Isaac C. NORMAN, Appellant,

v.

NICHIRO GYOGYO KAISHA, LTD.
(Nichiro Fisheries Co., Ltd.) Nichiro
Pacific, Ltd., Appellees.

No. 5254.

Supreme Court of Alaska.

May 28, 1982.

James D. Rhodes, Hartig, Rhodes, Norman & Mahoney, Anchorage, and Jonathan B. Noll, Foster, Pepper & Riviera, Seattle, Wash., for appellant.

John S. Hedland and James T. Brennan, Hedland, Fleischer & Friedman, Anchorage, for appellees.

Before RABINOWITZ, C. J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

CONNOR, Justice.

This is an appeal of a grant of partial summary judgment [1] dismissing Counts II through IX of plaintiff's amended complaint. Most of the counts were dismissed on the alternative grounds that the plaintiff had no individual right of action for breach of a shareholders agreement and that the claims might be barred under the doctrine of res judicata. The remaining counts of the amended complaint were dismissed as barred by the statute of limitations, since they did not arise out of the same conduct, transaction or occurrence asserted in the original complaint.

## FACTS

The facts, viewed most favorably to plaintiff,[2] are as follows. Plaintiff Isaac C.

Norman was a civilian employee of the U. S. Navy at Adak, Alaska, from 1965 to 1973. During his eight years at Adak, Norman formulated the concept of establishing a land-based fish processing facility at Finger Bay, Adak. He spent several years observing the processing methods aboard fish processing vessels and studying movements of sea life around Adak. He concluded that a land-based facility would be feasible. In 1972, he was the successful bidder on a five-year lease from the Navy for certain lands and buildings on Finger Bay.

In November, 1972, Norman formed Adak Aleutian Processors, Inc. (AAP), an Alaskan corporation. Norman owned 100% of the stock of AAP. He transferred the Finger Bay lease, for which he had posted a $5,000 bond and paid the annual rent of $1,000, to the corporation.

By June, 1973, Norman had successfully attracted the interest of other parties with sufficient capital and expertise to begin making his proposed venture a reality. Norman's initial contact was Mr. Akira Otani, vice president, treasurer and manager of Market Place, a Hawaiian corporation engaged in the fishing industry. Through Otani, Norman came in contact with Takehiro Hikita, whose family owned more than 90% of Alaska Shokai, a Japanese corporation, and controlled Alaska Foods, Inc., a Washington corporation and wholly-owned subsidiary of Alaska Shokai. Both corporations were involved in the fish trading business. The final contact was with Nichiro Gyogyo Kaisha, Ltd. (NGK), a Japanese corporation, and its affiliate, Nichiro Pacific, Ltd. (NPL), a Washington corporation, the defendants in this case. NGK and NPL, too, were actively involved in the fishing industry, in Japan as well as in the United States.

On June 8, 1973, the parties entered into three agreements which are the basis of this litigation. The first agreement involved the sale of AAP stock by Norman to

1. The trial court directed the entry of a final judgment under Alaska Rule of Civil Procedure 54(b) after determining that there was "no just reason for delay."

2. In reviewing a grant of summary judgment, we construe the facts most favorably to the losing party below. *Wickwire v. McFadden*, 576 P.2d 986 (Alaska 1978).

Market Place, Alaska Foods and NGK. Under the agreement, Norman sold 10% of the stock to Market Place and 30% each to Alaska Foods and NGK. Norman retained 20%.[3] The purchasers agreed to pay Norman $200,000, jointly and severally. $40,000 was paid initially, with the remaining amount to be paid in subsequent years.

The second agreement, entered into by Norman and AAP, related to Norman's prospective employment by AAP if and when he terminated his employment with the Navy.

The third agreement, executed by all AAP shareholders and entitled "shareholders agreement," set out the general plan of operation and administration of AAP. Among other things, the shareholders collectively agreed to "exert their best efforts to achieve the corporate and business purposes of AAP." Certain other provisions related to voting rights, sale of stock, and distribution and marketing rights. Finally, Alaska Foods and NGK agreed to loan AAP sufficient funds for plant construction and working capital, and to provide technical assistance and personnel.

Norman resigned from his civil service position with the Navy to devote his full-time efforts as an employee of AAP. Under NGK's direction, the processing plant was completed in November of 1973. Operations were begun midway through the 1973–74 season.

AAP was plagued with problems from the beginning. The total cost of construction of the plant came to $3.2 million, which was $2.5 million more than the original estimate of $700,000. The 1973–74 season was unprofitable, partly because of the late start and partly because of mismanagement by NGK. Personnel problems arose between Norman and NGK employees until, in August of 1974, NGK terminated Norman's employment with AAP. Then, several days into the 1974–75 season, NGK suddenly and completely pulled out of the AAP venture.

This lawsuit was filed in April, 1975.[4] The original complaint was brought by Norman against NGK and sought to recover the $120,000 still owed to him under the stock purchase agreement. NGK counterclaimed, alleging Securities Act violations in the original stock transaction. In addition, NGK filed third party complaints against Alaska Foods and Market Place for their pro rata share of any money owing under the stock purchase agreement.

In August, 1977, Norman amended his complaint to add NPL as a defendant[5] and to add Counts II through IX to the complaint. Count I re-alleges a breach of the stock purchase agreement; Counts II through VI(a) and IX are based on alleged breaches of the shareholders agreement; and Counts VI(b) through IX are tort claims.[6] Defendants NGK and NPL were

---

**3.** Prior to the agreement, Norman had transferred 10% of the AAP stock to Otani as a "finder's fee." Otani subsequently transferred the stock to his son, Daniel Y. Otani.

**4.** NGK's action was the basis of several other lawsuits between the various parties:

In June of 1975, NPL brought an action against AAP for re-imbursement of working capital loans. AAP counterclaimed, alleging mismanagement and abandonment. In June, 1976, NPL was awarded summary judgment, subject to AAP's right to pursue its counterclaim. The counterclaim was dismissed in December of 1979.

In July of 1975, AAP filed suit in the federal district court against NGK and its affiliate, NPL, for mismanagement and abandonment. In May, 1976, the action was dismissed by stipulation without findings of any kind.

In August, 1975, the Bank of California brought suit against AAP and NPL to foreclose on promissory notes securing the loans from Alaska Foods to AAP, which Alaska Foods has assigned to the bank. AAP crossclaimed against NPL, again asserting mismanagement and abandonment. NPL also crossclaimed against AAP to foreclose on its loans to AAP. Both the bank and NPL were successful in their claims against AAP; and AAP's crossclaim was dismissed for failure of AAP to answer interrogatories.

**5.** NPL was added as a defendant on the theory that it is the alter ego of NGK. Norman seeks an order piercing the corporate veil of either to reach the other.

**6.** Count IX incorporates by reference all the previous counts and alleges breach of the fiduciary duty arising under the shareholders

awarded summary judgment with respect to Counts II through IX on February 29, 1980, and on portions of Count I on September 5, 1980. Norman appeals the grant of partial summary judgment.

## ISSUES

There are three issues on appeal: first, whether Norman has an individual action against NGK and NPL for breach of the shareholders agreement; second, whether such claims are barred under the doctrines of res judicata and collateral estoppel; and, third, whether the tort claims are barred by the statute of limitations.

## INDIVIDUAL ACTION

Counts II through VI(a) and IX of Norman's amended complaint are based on alleged breaches of the shareholders agreement. Count II alleges that NGK and NPL failed to exert their best efforts to achieve the corporate and business purposes of AAP; Count III alleges that NGK and NPL breached the contract by accumulating over $100,000 in debts on behalf of AAP; Count IV alleges failure to furnish AAP with sufficient and necessary funds for construction and installation of new improvements, equipment and facilities; Count V alleges failure to supply sufficient working capital funds to AAP; Count VI(a) alleges failure to supply technical assistance to AAP; and Count IX alleges breach of fiduciary duties to Norman. As a result of these breaches, Norman seeks damages of $720,000, plus interest, for loss of value of his stock.[7]

■ Defendants argue, and the superior court held, that Norman has no individual cause of action against NGK and NPL for breach of the shareholders agreement; rather, such an action can only be brought by the corporation (AAP) or by a sharehold-

er in a derivative suit on behalf of the corporation.[8] This is consistent with the general rule that a shareholder has no individual right of action against third parties for acts producing harm to the corporation and thereby diminishing the value of the stock, since injury to the individual shareholder is merely incidental to the injury to the corporation. *Arctic Contractors, Inc. v. State*, 573 P.2d 1385, 1386 (Alaska 1978); *Martin v. Maldonado*, 572 P.2d 763, 773 (Alaska 1977). The rule is based on the principle that where such an injury occurs, each shareholder suffers in proportion to the number of shares he or she holds. Thus, each will be made whole if the corporation obtains compensation from the wrongdoer. *Commonwealth of Massachusetts v. Davis*, 140 Tex. 398, 168 S.W.2d 216, 221 (1943).

This rule is grounded on sound policy. First, a contrary rule would authorize suits by each shareholder and result in a multiplicity of suits against the wrongdoer. *E. K. Buck Retail Stores v. Harkert*, 157 Neb. 867, 62 N.W.2d 288, 307 (1954). Further, the rule is necessary so that damages recovered by the corporation may be available for payment of the corporation's creditors. *Martin v. Maldonado*, 572 P.2d 763, 773 at n.34 (Alaska 1977). In addition, permitting individual recovery could have the effect of removing from the board of directors its prerogative to use the recovered damages for any legitimate business purpose. *Commonwealth of Massachusetts v. Davis*, 140 Tex. 398, 168 S.W.2d 216, 221 (1943).

Norman argues that he has suffered a direct, rather than an incidental, injury and is, therefore, entitled to bring an individual action against NGK and NPL. In order to show direct injury, Norman must show that NGK and NPL owed him a special duty or that he suffered an injury separate and

---

agreement. The trial court treated the count as sounding in contract as well as in tort.

7. Norman also seeks recovery of other damages, for a total of more than $2.5 million. *See* note 10, *infra.*

8. Defendants concede that the remaining claims (Counts I, VI(b), VII and VIII) are individual claims of Norman's.

distinct from that suffered by the other shareholders.[9]

Norman claims that he has suffered injuries different from the injuries suffered by the other shareholders. These separate injuries, according to Norman, are loss of 40% of the stock purchase price, loss of a new job, and loss of "opportunity." However, the two former injuries were not the result of the breach of the shareholders agreement; indeed, these injuries are the subject of other counts of the complaint and NGK and NPL do not contest Norman's right to sue individually on them. The lost "opportunity," on the other hand, is an injury suffered in common by the shareholders. Each shareholder signed the shareholders agreement in the hopes that AAP would prosper; the corporation represented an opportunity for each shareholder and any benefits would accrue to the shareholder in its capacity as a shareholder.

Counts II through VI(a) of Norman's amended complaint clearly allege wrongs committed directly against the corporation rather than against Norman individually: Count II is directed at NGK's and NPL's failure to exert best efforts to achieve the purposes of AAP; Count III concerns wrongful accumulation of debts on behalf of AAP; and Counts IV–VI involve the failure to provide AAP with sufficient funds and technical assistance. Count IX alleges breach of a fiduciary duty to Norman; however, any fiduciary duty under the shareholders agreement was owed to the corporation or to the shareholders as a whole.

Moreover, Norman's statement of damages indicates that he recognized that each shareholder suffered the same injury. As stated earlier, Norman seeks to recover for the loss and destruction of his stock caused by defendants' breach of the shareholders agreement.[10] Norman measures this damage as 20% (his stock ownership interest) of the minimum book value of the stock assuming defendants had not breached. The court in *E. K. Buck Retail Stores v. Harkert*, 157 Neb. 867, 62 N.W.2d 288 (1954), was confronted with a similar situation. In that case, plaintiffs and defendants entered into a "stockholders control agreement" providing that, in return for a $90,000 investment, plaintiffs would get 40% of the corporation's stock and equal representation on the board of directors. The contract also included a voting agreement. In an action for breach of the control agreement, plaintiffs sought a personal judgment for 40%, based on their stock ownership of 40%, of the losses sustained as a result of the breach. The court, in its holding that no individual right of action existed, noted

9. The courts vary in their articulations of the test for showing direct injury. Some courts require the violation of a special duty owed to the shareholder. *See Weiss v. Northwest Acceptance Corp.*, 274 Or. 343, 546 P.2d 1065, 1069 (1976). Other courts require that the shareholder suffer a separate and distinct injury from that suffered by other shareholders. *See E. K. Buck Retail Stores v. Harkert*, 157 Neb. 867, 62 N.W.2d 288, 307 (1954). We have used both phrases. *Compare Martin v. Maldonado*, 572 P.2d 763, 773 (Alaska 1977) (finding no special duty), *with Arctic Contractors, Inc. v. State*, 573 P.2d 1385, 1386 (Alaska 1978) (finding neither an injury separate from harms allegedly done to the corporation nor a special duty). Defendants argue that Norman must prove *both* a special duty *and* a separate injury. While we recognize that the two concepts will usually, if not always, overlap (*i.e.*, a violation of a special duty will cause a separate injury and, conversely, a separate injury will be the result of a violation of a special duty), we prefer to state the test in the disjunctive.

10. We note that Counts II through VI(a) and IX of Norman's complaint merely allege that, as a result of the various breaches of the shareholders agreement, "the Plaintiff was damaged"; and the prayer for relief merely seeks "compensatory damages," "punitive and exemplary damages," costs and interest. In his separate breakdown of the damages sought, Norman does not specify which damages flow from which Counts. However, the loss of stock is clearly the principal item of damages claimed as a result of the breach of the shareholders agreement. ·Other damages sought are the balance due under the stock purchase agreement, lost wages, costs of relocation, costs of formation/promotion, medical expenses, legal expenses and punitive damages. None of these damages, except arguably the costs of formation/promotion and some legal expenses, would be proper remedies for breach of the shareholders agreement.

that plaintiffs' prayer for damages indicated that they recognized that the injuries resulted to all shareholders. 62 N.W.2d at 307. Likewise, in the instant case, Norman's alleged damages reflect the fact that all AAP shareholders suffered the same loss as a result of the breach of the shareholders agreement. It is thus clear from Norman's allegations and items of damages that his injury was the same as that to the other shareholders.

■ Norman also argues that NGK and NPL owe him a special duty arising out of the contractual relationship under the shareholders agreement. He asserts that this special duty entitles him to maintain an individual action even though the corporation may have a right of action on the breach of the shareholders agreement. This is true only if the duty is owed to him directly and has its origin in circumstances independent of his status as a stockholder. *Shaw v. Empire Savings & Loan Ass'n,* 186 Cal.App.2d 401, 9 Cal.Rptr. 204, 208 (1960); W. Fletcher, Cyclopedia of the Law of Private Corporations, § 5921 at 331 (rev. vol. 1980).

Here, again, the *E. K. Buck* case is instructive. The Nebraska Supreme Court held that the entry of the parties into the shareholders control agreement did not operate to confer upon plaintiffs the right to bring an individual direct action. 62 N.W.2d at 307. According to the court, the control agreement merely established a business policy and the means to carry out that policy. The court pointed out that the only reason the agreement was valid was that it was for the benefit of the corporation and all shareholders alike. *Id.* Thus, any duties owed under the agreement were owed primarily to the corporation and its shareholders.

A reading of the shareholders agreement in the instant case shows that it, like the agreement in *E. K. Buck,* was intended to benefit the corporation and all shareholders alike. The purpose of the agreement is set forth in the preamble:

"WHEREAS, said shareholders desire to enter into an operating agreement as to the general plan of administration and operation of AAP in developing its 10 acre lease at Finger Bay, Adak, Alaska ..."

The subsequent paragraphs set out the means to effectuate that end. In paragraph 1, the shareholders collectively agree to "exert their best efforts to achieve the corporate and business purposes of AAP." Paragraphs 2 and 3 are voting agreements regarding elections and stock transferability. In paragraph 4, certain distribution and marketing rights are granted to Otani, NGK and Alaska Foods; and, in paragraph 5 the shareholders agree that AAP will be administered and operated in accordance with the articles and by-laws. Paragraph 6 is the heart of the shareholders agreement. The portion setting out NGK's duty is as follows:

"6. *In furtherance of the corporate and business purposes of AAP,* shareholders respectively agree as follows:

(a) [NGK] agrees to:

1. Furnish *to AAP* sufficient and necessary funds for the construction and installation of new improvements, equipment and facilities for the Adak operations, upon such terms and conditions as shall then be determined and agreed upon *between [NGK] and AAP.*

2. Furnish *to AAP* working capital funds required by the Adak operations up to the sum of $2,000,000, upon such terms and conditions as shall then be separately agreed upon *between [NGK] and AAP.*

3. Furnish technical assistance *to AAP* for the Adak operations ... all in accordance with such terms and conditions as shall then be determined and agreed upon *between AAP and [NGK]* ..." (Emphasis added.)

It is clear that NGK's duties under the shareholders agreement are owed primarily to AAP. Any benefit derived by Norman would be in his capacity as a shareholder.

Norman stresses that the shareholders agreement was not executed in a vacuum. He urges us to read that agreement in conjunction with the stock purchase agree-

ment and the employment agreement, which were entered into simultaneously with the shareholders agreement. According to Norman, the three agreements and the surrounding circumstances make up the entire deal and confer upon him three special rights: (1) the right to receive $200,000 for the AAP stock; (2) the right to be employed by AAP; and, most importantly, (3) the right to have NGK and the other parties perform their obligations under the shareholders agreement. Norman maintains that these three rights are unseverable. We disagree.

Norman's right to receive the balance of the purchase price of the AAP stock is derived solely from the stock purchase agreement and belongs directly to him; NGK and NPL do not contest Norman's right to sue individually on that claim. Similarly, Norman's right to be employed by AAP is derived solely from the employment agreement and belongs directly to him; NGK and NPL also do not contest Norman's right to sue as an individual for tortious interference with that contract. Likewise, Norman's right to have the parties perform their obligations under the shareholders agreement is derived solely from that agreement. However, Norman's right is only incidental; that right belongs directly to the corporation. That Norman has two individual causes of action against a wrongdoer does not entitle him to pursue a corporate claim. *See Weiss v. Northwest Acceptance Corp.*, 274 Or. 343, 546 P.2d 1065 (1976).[11]

Since Norman has not shown a direct injury, through either a violation of a special duty owed to him or an injury separate and distinct from that suffered by the other AAP shareholders, he may not maintain an individual action against NGK and NPL for breach of the shareholders agreement. We thus conclude that the trial court was correct in granting partial summary judgment as to Counts II through VI(a) and IX of plaintiff's amended complaint.

## RES JUDICATA

The trial court also held that the claims stated in Counts II through VI(a) and IX of the amended complaint were based on the same cause of action as that alleged by AAP in two of the previously described lawsuits,[12] and would, therefore, be barred by the doctrines of res judicata and collateral estoppel if asserted by AAP or any party in privity with AAP. The court found that a genuine issue of material fact existed as to whether plaintiff Norman was in privity with AAP. In view of our holding that Norman is not entitled to maintain an individual action for breach of the shareholders agreement, we find it unnecessary to decide the res judicata issue.

## TORT CLAIMS

Counts VI(b) through IX of Norman's amended complaint are tort claims against NGK and NPL. Count VI(b) alleges tortious interference with Norman's employment with AAP; Count VII alleges that Norman suffered humiliation, mental anguish and physical stress as a result of NGK's and NPL's wrongful acts; Count

---

11. It is immaterial that AAP was not a party to the shareholders agreement. In *Green v. Victor Talking Machine Co.*, 24 F.2d 378 (2d Cir. 1928), the court stated that "despite the fact that [the contract] was made with a shareholder, not with the corporation, nevertheless a breach of [the contractual] duty would give a right of action to the corporation, not to its shareholders." *Id.* at 382. As Norman points out, in the other lawsuits between the parties NGK and NPL have consistently asserted that because AAP was not a party to the shareholders agreement it has no rights thereunder. Obviously, NGK and NPL cannot have it both ways; otherwise, nobody would be able to sue

for breach of the shareholders agreement. In our holding that Norman does not have an individual right of action it is implicit that AAP would have a right of action against NGK and NPL for breach of the shareholders agreement. Since the corporation is no longer in existence and thus has no capacity to sue, the right of action rests with the directors and shareholders as the corporation's representatives. *Cullum v. General Motors Acceptance Corp.*, 115 S.W.2d 1196, 1202–03 (Tex.Civ.App.1938).

12. *NPL v. AAP* and *Bank of California v. AAP and NPL.* See footnote 4, *supra*.

VIII alleges that NGK and NPL acted maliciously and with wanton disregard of Norman's rights and feelings; and Count IX alleges breach of fiduciary duty. The trial court dismissed Counts VI(b) through IX, holding that they were barred by the statute of limitations.

The statute of limitations on tort claims is two years. AS 09.10.070.[13] Norman's original complaint, alleging violation of the stock purchase agreement, was filed in April, 1975. The amended complaint was filed in August of 1977, more than two years after the alleged wrongful acts were committed. In order to avoid the bar of the statute of limitations, Norman contends that the new claims come within the ambit of Alaska Civil Rule 15(c), which provides in part:

> "Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading."

Thus, if the tort claims arose out of the same conduct, transaction or occurrence asserted in the original complaint, then the amendment will "relate back" to the date of the original complaint, which was filed well within the statute of limitations.

Norman cites *Burns v. Anchorage Funeral Chapel*, 495 P.2d 70 (Alaska 1972), and *Jakoski v. Holland*, 520 P.2d 569 (Alaska 1974), in support of his assertion that the tort claims arose out of the same conduct alleged in the original complaint. In *Burns*, the administrator of an estate sought to add decedent's next of kin as plaintiffs in a wrongful death action. We held that the amendment related back to the date of the original complaint, since the defendant "was sufficiently informed of the nature of the asserted claim for relief so that no new claim for relief would have been injected"

by the amendment. 495 P.2d at 75. We went on to state:

> "Our analysis is in accord with the basic rule applied by federal courts in determining whether an amendment introduces a new claim for relief. The federal authorities hold that if the amendment is based on the *same specific conduct* of the defendant upon which the original claim for relief was founded, no new claim for relief is stated by the amendment." (Emphasis added.)

*Id.*

The *Burns* principle was held to be dispositive in *Jakoski*, an action for personal injury damages arising out of an automobile accident. After the statute of limitations had run, plaintiff filed an amended complaint adding her husband as a plaintiff and adding his claim for loss of consortium based upon the same accident. We held there that the amendment related back to the date of the original complaint. The salient fact was that the defendant had ample notice of the cause of action, since the new claim was based on the identical conduct, transaction and occurrence relied upon in the original pleading. 520 P.2d at 576.

■ Unlike the amended claims in *Burns* and *Jakoski*, Norman's tort claims are not based on the identical conduct upon which his original claim was founded. Norman's original complaint alleged only that NGK was liable for the balance due under the stock purchase agreement. The "conduct, transaction or occurrence" underlying the complaint involves the circumstances surrounding the purchase and sale of the stock and the subsequent failure to pay for the stock. The original action thus did not give NGK notice of any tort claims related to mismanagement or abandonment of AAP; nor did it give notice of a claim for tortious interference with the employment contract.

---

**13.** AS 09.10.070 reads:

> "No person may bring an action (1) for libel, slander, assault, battery, seduction, false imprisonment, or for any injury to the person or rights of another not arising on contract and not specifically provided otherwise ... unless commenced within two years."

Norman does not dispute the trial court's determination that Counts VI(b) through IX are tort claims and hence subject to the two-year statute of limitations.

We do not mean to hold that an amendment must be based on the *identical* conduct, transaction or occurrence set forth in the original pleading. However, the new allegations must be sufficiently related to the conduct, transaction or occurrence originally set forth so as to avoid prejudice to the opposing party and to ensure that the opposing party has notice of the nature of the claim from the beginning. *Green v. Walsh*, 21 F.R.D. 15, 18 (D.C.Wis.1957). Norman's tort claims in his amended complaint fail to meet this standard and, therefore, do not relate back to the date of the original complaint. The superior court was correct in dismissing Counts VI(b) through IX as barred by the statute of limitations.

AFFIRMED.

MATTHEWS, Justice, dissenting, joined by RABINOWITZ, Justice.

I disagree with the majority's resolution of the individual cause of action and statute of limitations issues.

## INDIVIDUAL CAUSE OF ACTION

In my view the majority has misapplied the general rule that an action to redress injuries to a corporation cannot be maintained by a stockholder in his own name. The rule does not apply where there is a relationship between the shareholder and the wrongdoer "independent of [that] which the shareholder derives through his interest in the corporate assets and business." *Green v. Victor Talking Machine Co.*, 24 F.2d 378, 381 (2nd Cir. 1928); *Hidalgo v. McCauley*, 50 Ariz. 178, 70 P.2d 443 (1937). *See generally* Annot.—Stockholders' Right of Action, 167 A.L.R. 279, 285–87 (1947).

Here the relationship between Norman and NGK was that of direct contracting parties. Norman agreed to transfer thirty per cent of his stock to NGK in exchange for, among other things, NGK's promise to furnish construction and working capital to AAP. That promise created a duty in NGK running to Norman, the promisee, as well as to AAP, the beneficiary. The Restatement (Second) of Contracts § 305(1) (1980) makes this clear:

A promise in a contract *creates a duty in the promisor to the promisee* to perform the promise even though he also has a similar duty to an intended beneficiary. [Emphasis added]

In *Martin v. Maldonado*, 572 P.2d 763, 773 n.34 (Alaska 1977), we recognized that the rule prohibiting individual shareholder suits has no application to a suit brought by a shareholder where "there is a violation of a duty owed directly to him." Similarly, in *Arctic Contractors, Inc. v. State*, 573 P.2d 1385, 1386 (Alaska 1978), we noted that the shareholder's suit there would fail because he had not "shown a special duty owed to him directly". In the present case, since there is a direct duty running from NGK to Norman, that of promisor to promisee, Norman's suit should be allowed. The majority opinion correctly recognizes that the violation of a duty owed directly to a shareholder suffices to give rise to a shareholder's suit. P. 195, fn. 9. However, the majority never comes to grips with the point that NGK as a promissor owed a duty to Norman, the promisee, to contribute money to the corporation. That is exactly the type of duty which courts have found to justify suits by shareholders who have contracted with others to confer a benefit on a corporation.

One good example of such a case is *Eden v. Miller*, 37 F.2d 8 (2nd Cir. 1930). There the defendant promised plaintiffs that he would pay a corporation, to be organized, a certain sum of money as operating capital and perform services for the corporation. The court found that plaintiffs could enforce the promise, even though the corporation had a right of action as well, stating:

Because they performed their promises by organizing the corporation, taking employment, and making an investment in it, in reliance upon the now broken promise of the defendant to give to the business both financial and personal aid, they claim to have been damaged. For such damages as they can prove they may recover, regardless of any cause of action the corporation may have against the defendant. Their right is analogous to that

of a debtor, with whom a third person has contracted to pay the debt to the creditor. *Id.* 9–10. Another illustrative case is *Meyerson v. Franklin Knitting Mills*, 185 A.D. 458, 172 N.Y.S. 773 (App.Div.1918). There the plaintiff had purchased stock from the defendant and the defendant in turn had promised to continue to supply goods and credit to the corporation. The court held that the plaintiff could sue for breach of the defendant's promise, stating that the plaintiff's agreement to buy stock

> was not based upon defendant's mere promise to turn the stock over to him. It was not the mere paper shares that plaintiff wanted, but shares that would be valuable as representing an interest in a going concern, which the defendant undertook to supply with credit and with goods. Defendant did not fulfill its contract with the plaintiff merely by delivering to him the shares. *The most material part of its undertaking was to supply the clothing company*, which was in effect being bought by the plaintiff, *with credit and goods.*
>
> The breach of this covenant gave plaintiff a cause of action . . . .

172 N.Y.S. at 774. [Emphasis supplied] *See also Higgins v. Applebaum*, 186 A.D. 682, 174 N.Y.S. 807 (App.Div.1919) where the court stated:

> It is true that ordinarily a stockholder has no right of action against a director for wrecking the corporation and depreciating the value of the stock. Where, however, the value of his stock has been depreciated by the failure of his cocontractor to furnish moneys needed by the corporation which he has stipulated with plaintiff to advance, then the damage is directly traceable to his breach of contract and for that damage he may be held individually liable to the stockholder whose stock has been thus depreciated.

*Id.* 174 N.Y.S. at 810.

### TORT CLAIMS

The majority dismisses Norman's tort claims on statute of limitations grounds, finding that they did not arise out of the same "conduct, transaction or occurrence" as that set out in the original claim. I disagree on this point as well.

Norman's original complaint alleged that an agreement was made on June 8, 1973 and that it was broken by NGK. The amended complaint alleges torts which were committed by NGK by the acts constituting breaches of the June 8th agreement. I fail to see how it can be concluded that these torts did not arise out of the same transaction as that alleged in the original complaint. And, of course, the fact that these are tort claims while the original claim was in contract, is irrelevant.

> [A]n amendment which changes only the legal theory of the action, *or adds another claim arising out of the same transaction or occurrence*, will relate back. Thus, an amendment will relate back which changes the theory of recovery as to the type of negligence claimed, or adds additional grounds of negligence, *changes the theory of the action from one based on contract to one sounding in tort, . . . or increases the amount of damages claimed.* [Footnotes omitted, emphasis added].

J. Moore, 3 Moore's Federal Practice, ¶ 15.-15[3] at 15–198 to 206.